UNITED STATES of America,
Plaintiff,

v.

AMERICAN SMELTING AND REFINING COMPANY, St. Joseph Lead Company, and the Bunker Hill Company, Defendants.

United States District Court
S. D. New York.
April 7, 1960.

Richard B. O'Donnell, New York City, Allen A. Dobey, Jos. W. Stanley and John

C. Fricano, Washington, D. C., for Government.

Cleary, Gottlieb, Friendly & Hamilton, New York City, for American Smelting.

Debevoise, Plimpton & McLean, by Edw. C. McLean and Jos. Barbash, New York City, for St. Joseph Lead.

Skadden, Arps, Slate & Timbers, by Leslie H. Arps and Robert J. Ensher, New York City, for Bunker Hill.

EDELSTEIN, District Judge.

1. St. Joseph Lead Company (hereinafter referred to as "St. Joe") is a corporation organized and existing under the laws of the State of New York with general offices and principal place of business at 250 Park Avenue, New York, N. Y.

2. St. Joe transacts business within the Southern District of New York.

3. The Bunker Hill Company (hereinafter referred to as "Bunker Hill") is a corporation organized and existing under the laws of the State of Delaware with general offices and principal place of business at 660 Market Street, San Francisco, California.

4. Prior to March 22, 1924, Bunker Hill was incorporated under the laws of the State of Oregon, but on March 24, 1924, Bunker Hill incorporated under the laws of the State of Delaware, without any substantial change in the management or the nature of the business of the company. In 1956 Bunker Hill's name was changed from "Bunker Hill & Sullivan Mining and Concentrating Company" to "The Bunker Hill Company". Whenever the term "Bunker Hill" is used herein it shall be deemed to include the Bunker Hill & Sullivan Mining and Concentrating Company as incorporated under the laws of the State of Oregon and subsequently under the laws of the State of Delaware.

The Defendants

5. St. Joe was incorporated in 1864 for the purpose, among other things, of mining and smelting lead and other minerals.

6. St. Joe operates a lead smelter and refinery at Herculaneum, Missouri, and is engaged in lead mining in Missouri and to a slight extent in New York.

7. St. Joe presently mines and for some years past has mined more lead than any other lead mining company in the United States.

8. St. Joe is a substantial competitive factor in the business of smelting, refining and marketing lead in the United States.

9. Bunker Hill is the second largest miner of lead in the United States (second only to St. Joe).

10. In or about 1917 Bunker Hill constructed a lead smelter and refinery at Kellogg, Idaho, which Bunker Hill has continued to operate to date.

11. In 1949 Bunker Hill produced approximately 7 per cent of all the refined primary lead (lead made from lead-bearing ores and concentrates as distinguished from secondary lead made from scrap) produced in the United States.

12. Bunker Hill is a substantial competitive factor in the business of smelting, refining and marketing lead in the United States.

Trade and Commerce

13. In the conduct of its business St. Joe ships lead concentrates from the state in which they are produced to other states for smelting and refining; imports lead and lead-bearing materials from foreign countries; and ships primary lead from the state in which it is produced to buyers in other states. From time to time St. Joe sold and shipped primary lead produced in the United States to customers located in foreign countries, but has not exported any lead since 1940.

14. In the conduct of its business Bunker Hill ships lead-bearing ores and concentrates produced in one state to another state for smelting and refining; imports lead-bearing materials from foreign countries; and ships primary lead produced in one state to buyers in another state. From time to time

Bunker Hill also sold and shipped primary lead produced in the United States to customers located in foreign countries, but has not exported any lead since 1941.

### Sales of Bunker Hill Lead By L. Vogelstein & Company and The American Metal Company, 1917–1922

15. From 1910 to 1920, L. Vogelstein & Co. of New York City marketed lead in the eastern part of the United States and sold lead to the same consumers as the American Smelting and Refining Company (hereinafter referred to as "ASR") and St. Joe.

16. On January 1, 1920, the American Metal Company merged with L. Vogelstein & Co.

17. In 1920 the American Metal Company took over the entire business of L. Vogelstein & Co.

18. Bunker Hill, upon the erection of its smelter and refinery at Kellogg, Idaho, in 1917, began selling lead in the East to L. Vogelstein & Co. of New York City. In 1920 the American Metal Company of New York City took over the Bunker Hill contracts with L. Vogelstein & Co. Under these contracts Bunker Hill lead was sold outright to L. Vogelstein & Co. and later the American Metal Co. Bunker Hill made no direct sales in the East during this period. During this period all of Bunker Hill's lead was a corroding grade.

19. During the period (1917–1922) L. Vogelstein & Co. and later the American Metal Company were selling Bunker Hill lead, the Engineering and Mining Journal published on Wednesday afternoons a market quotation for lead for the preceding week which was the result of a Wednesday morning canvass of the various sellers who advised the Engineering and Mining Journal what tonnage they had sold at what price. The Engineering and Mining Journal averaged the prices in accordance with the tonnages sold at each price to arrive at a market quotation which represented an average price for the preceding week.

The Engineering and Mining Journal quotation was used by L. Vogelstein & Co. and the American Metal Company as a gauge in determining the price at which lead should be sold until a new quotation was published the following week.

20. ASR is the largest smelter and refiner of primary lead in the United States.

21. ASR announced a daily price for lead which was known in the trade as the "trust" price. Information as to the "trust" price was freely available to sellers of lead.

22. Prior to the merger of the American Metal Company with L. Vogelstein & Co., L. Vogelstein & Co. sometimes sold lead below the ASR New York "trust" price. This price-cutting on the part of L. Vogelstein & Co. occurred only when the officials of that company felt they had to sell the lead even if it meant selling below the current ASR price. Following the merger of the American Metal Company and L. Vogelstein & Co., the American Metal Company followed the same pricing practices as L. Vogelstein & Co., and occasionally sold lead below the "trust" price.

23. By selling below the ASR or "trust" price, L. Vogelstein & Co. and the American Metal Company lowered the average selling price of all sellers as reported weekly, on Wednesdays, in the Engineering and Mining Journal.

24. L. Vogelstein & Co. and the American Metal Company were "dealers" in lead, that is, they bought lead for resale. The policy of ASR and St. Joe was not to sell to dealers because dealers sometimes sold below the ASR or "trust" price and thus interfered with their market.

25. As indicated, L. Vogelstein & Co. from 1917 to 1920 and the American Metal Company from 1920 to 1922 sometimes sold lead below the ASR "trust" price. This occurred when L. Vogelstein & Co. or the American Metal Company became overstocked with lead which they could not sell at the current quoted price

and they needed the money for the lead. As a result L. Vogelstein & Co. and the American Metal Company were a disturbing factor on the market quotations and tended to upset the market price which ASR and St. Joe were holding.

26. L. Vogelstein & Co. or the American Metal Company stored lead at Bunker Hill's smelter when the lead could not be sold and on these occasions L. Vogelstein & Co. or the American Metal Company paid Bunker Hill storage charges for storing the lead. On infrequent occasions only, L. Vogelstein & Co. and the American Metal Company may have stored Bunker Hill lead at Kellogg in order to take advantage of a rising market.

27. L. Vogelstein & Co. and the American Metal Company sold Bunker Hill lead under Bunker Hill's brand name so that customers who bought the lead knew it was coming from the Bunker Hill smelter.

28. During the period 1920–1922 when the American Metal Company sold Bunker Hill lead in the eastern part of the United States the American Metal Company owned and operated a lead mine and a lead smelter and refinery at Monterrey, Mexico, which the Company had acquired long prior to 1920. ASR also owned a smelter and refinery at Monterrey, Mexico. (The American Metal Company and ASR still operate these Mexican smelters and refineries.) At times the American Metal Company sold lead from its Mexican smelter and refinery in the eastern part of the United States and also in the midwest, depending upon the tariff situation.

29. L. Vogelstein & Co. from 1917 to 1920 and the American Metal Company from 1920 to 1922 sold Bunker Hill lead in the eastern part of the United States to the major consumers of lead.

30. From 1917 to 1922 Bunker Hill corroding grade lead was sold in competition with St. Joe's Doe Run Lead, also of corroding grade.

31. L. Vogelstein & Co. and the American Metal Company tried to sell Bunker Hill's corroding grade lead at a premium of $1 a ton over the common lead price but occasionally cut the premium to 50 cents a ton and on some occasions very probably charged no premium at all.

32. Prior to 1913 St. Joe sold its lead through brokers and dealers. The dealers who bought St. Joe's lead for resale included the American Metal Company and Adam Hirsch and Co. St Joe at this time had no selling organization of its own. In 1913 Clinton H. Crane became president of St. Joe. Crane established St. Joe's own selling organization to sell lead to consumers, and St. Joe after 1913 sold its lead directly to consumers with the exception of less than carload lots which were sold through dealers.

Motives for The St. Joe-Bunker Hill Contracts

33. Toward the end of 1919 Clinton H. Crane, President of St. Joe, advised F. W. Bradley, President of Bunker Hill, that Bunker Hill was making a mistake in selling lead to middlemen; that St. Joe was interested in buying Bunker Hill's lead; and that if St. Joe bought Bunker Hill's lead it would avoid the necessity of St. Joe making corroding lead of its own. However, Crane stated that his primary purpose was to take the sale of Bunker Hill lead out of the hands of the American Metal Company because he believed that the policy of the American Metal Company in the sale of Bunker Hill lead accentuated swings in the market and that lessening the price variations of lead would be good both for St. Joe and its customers. Because of his desire for price stabilization of this character Crane desired to control the sale of Bunker Hill lead.

34. In early 1920 F. H. Brownell, Vice President of ASR, endeavored to interest Bunker Hill in an arrangement whereby ASR would market Bunker Hill's lead, and Brownell complained to Stanly Easton, Manager of Bunker Hill's operations, that the American Metal Company and Mr. Vogelstein, who at that time were marketing Bunker Hill's lead in the East,

were a disturbing factor in the lead marketing situation and made it difficult to maintain "a suitable high price."

35. In December of 1920 F. H. Brownell, Vice President of ASR, restated to Stanly Easton, Manager of Bunker Hill's operations, his criticism of the American Metal Company and said that it was currently reported, in connection with the falling lead market, that Mr. Vogelstein of the American Metal Company had said that no matter how ASR cut the lead price he would sell ¼ cent a pound under them.

36. It was the policy of the American Metal Company to cut the ASR official price (the "trust" price) in selling Bunker Hill lead when sales could not be made at that price.

37. The American Metal Company paid Bunker Hill the full market price (less commission) for Bunker Hill lead, and Bunker Hill regarded any price cutting on the resale of the lead by the American Metal Company as the American Metal Company's own affair.

38. At or about the same time (December, 1920) that F. H. Brownell, Vice President of ASR, restated to Stanly Easton his criticism of the American Metal Company, for its price-cutting activities, Clinton Crane, President of St. Joe wrote a letter to F. W. Bradley, President of Bunker Hill, in which he stated:

"The present condition in the lead market emphasizes particularly the bad features of your present contract as it is directly to Mr. Vogelstein's interests to have the market as low as possible at the moment."

As a result of Brownell's conversations with Easton and Crane's letter to Bradley, both critical of the American Metal Company, Bunker Hill concluded that it was "probably a thorn in the sides of people who are trying to hold up the price of lead."

39. Bunker Hill was advised of the price-cutting practices of the American Metal Company by ASR and St. Joe.

40. At the time when the American Metal Company lost the Bunker Hill contract to St. Joe in 1922, James Wallace, an official of Bunker Hill, told Ernest Hothorn, a buyer and seller of lead for the American Metal Company that one of the reasons Bunker Hill was not renewing its contract with the American Metal Company was the practice of the American Metal Company in cutting the prices.

41. One of the reasons Bunker Hill entered into the 1922 contract with St. Joe was that St. Joe, like Bunker Hill, was engaged in the mining, smelting and refining of lead and Bunker Hill considered that it and St. Joe had identical interests.

42. Another reason why Bunker Hill entered into the St. Joe-Bunker Hill contract was to achieve greater stability in the price of lead. Bunker Hill believed that the average New York selling price of lead would be higher if St. Joe sold Bunker Hill's lead in the East rather than the American Metal Company.

43. At the time the 1922 contract between Bunker Hill and St. Joe was entered into, St. Joe was selling Doe Run lead at a premium over common lead.

44. One of the objectives of the parties to the contract between St. Joe and Bunker Hill was the obtaining of a premium on Bunker Hill corroding lead equal to the premium obtained by St. Joe on Doe Run lead.

45. Clinton H. Crane, President of St. Joe, and his attorneys omitted any reference in the 1922 St. Joe-Bunker Hill contract to the subject of savings in freight resulting from shipments of Bunker Hill lead to localities where the price was higher than the New York price after taking into account the difference in the freight to the particular locality and the freight to New York. Mr. Crane and his attorneys were concerned about having anything in the contract which could be construed as a partnership or agency proposition and they were fearful that if there was a specific reference to such freight savings in the contract the contract might be construed by the Depart-

ment of Justice as a combination to control the price. As actually worded, the contract accomplished the same result by a provision with respect to "overage" pursuant to which St. Joe and Bunker Hill shared equally in the additional profit resulting from the sale of Bunker Hill lead by St. Joe in the localities where the price was higher than the New York price after taking into account the difference in the freight to New York and the freight to the particular locality.

### Contracts Between Bunker Hill and St. Joe, 1922 to Date

46. Beginning in 1922 and continuing to date St. Joe and Bunker Hill have been parties to a succession of contracts each of which has contained certain substantially identical basic provisions. These basic provisions have been and are:

(a) St. Joe is the exclusive seller of Bunker Hill lead in the eastern part of the United States and Canada (east of the 92nd meridian until July 1, 1932 and subsequent to July 1, 1932, east of the 95th meridian), and St. Joe is also the exclusive seller of Bunker Hill lead in certain foreign countries, with Bunker Hill precluded from marketing any of its lead in the domestic or foreign territory allocated to St. Joe.

(b) Control over the sale of Bunker Hill lead in the territory allocated to St. Joe is vested in St. Joe.

(c) Bunker Hill receives a proportionate share of the financial benefits derived from St. Joe's sales of Bunker Hill lead at locations where the price received is more favorable than the New York price after allowance for the difference in freight.

47. From 1922 to 1951 the successive contracts between St. Joe and Bunker Hill provided that St. Joe would endeavor to sell Bunker Hill lead for corroding purposes at a premium over the price of common lead, the intention being that the proportion of Bunker Hill corroding lead to all Bunker Hill lead to be sold by St. Joe was to be at least as great as the proportion of "Doe Run" to total St. Joe lead sold. By the contract effective January 1, 1951, and the subsequent and current contract effective January 1, 1956, a new proportion agreement was entered into whereby Bunker Hill was and is entitled to a formula percentage of St. Joe's total sales, related to the respective production of both companies.

48. The fundamental arrangements in all the St. Joe-Bunker Hill contracts from 1922 on have been the same.

### Competition Between Bunker Hill Lead and St. Joe Lead

49. Prior to the 1922 contract between St. Joe and Bunker Hill the two companies were competitors. Bunker Hill sold through others (see Finding 18, supra) in the eastern part of the United States.

50. At the time the 1922 contract between St. Joe and Bunker Hill was entered into, the eastern part of the United States was the principal market for lead in the United States. At this time Bunker Hill was the third largest lead producer in the United States.

51. St. Joe acquired more than one-half of the outstanding stock of the Doe Run Lead Company in 1913 and merged with that Company in 1936.

52. "Doe Run" is the brand name of St. Joe's corroding lead.

53. St. Joe began producing Doe Run lead, a corroding lead, before 1919. This corroding lead was obtained by the use of the Parkes process which removed the silver, copper and cobalt from the lead. Corroding lead is a lead which has been refined so that only a trace of other impurities is left in the lead.

54. At the time the St. Joe-Bunker Hill contract was entered into, Bunker Hill's lead mines produced an ore which was high in silver. There was so much silver in the ore that it could not be sold without a big loss unless the silver was removed. Accordingly, Bunker Hill's ores from its mines had to be refined by the Parkes process and the result was a corroding grade lead.

55. Doe Run lead is smelted and refined by the Herculaneum smelter and

refinery of St. Joe and initially comes from the same southeast Missouri lead as St. Joe's chemical lead.

56. From 1922 on St. Joe, in addition to selling Bunker Hill's corroding lead, has also sold corroding lead (Doe Run) produced by St. Joe.

57. Following the execution of the initial Bunker Hill-St. Joe contract in 1922 St. Joe began to sell less and less of Doe Run lead and more and more Bunker Hill corroding lead. The reason for this was the high cost of refining St. Joe lead to produce corroding grade lead.

58. At the time of the negotiations between Stanly A. Easton, General Manager of Bunker Hill, and Clinton H. Crane, President of St. Joe which led to the making of the original 1922 contract between St. Joe and Bunker Hill, it was stated that the lead Bunker Hill had for sale was corroding grade lead, and Mr. Easton and Mr. Crane both understood that Bunker Hill's corroding lead was equal to St. Joe's Doe Run lead.

59. Prior to the 1922 contract between St. Joe and Bunker Hill, St. Joe's Doe Run lead competed with Bunker Hill's corroding grade lead.

60. Corroding lead is used largely by white lead manufacturers and lead oxide manufacturers. Prior to 1922 St. Joe, at times when the business of such manufacturers was good, sold corroding lead at a premium of $3 a ton over the common lead price. However, St. Joe's refining cost was almost as much as the premium.

61. Bunker Hill corroding lead is one of the purest brands obtainable and has in the past commanded a premium of $3 a ton over the common lead price as compared with a premium of $2 a ton for ordinary corroding lead. The Bunker Hill product is unusually low in bismuth even for corroding grade lead and averages about .015.

62. Both Doe Run lead and Bunker Hill corroding lead can be used in the manufacture of white lead. Both are used in the manufacture of lead oxides for batteries. They are interchangeable in use and competitive. Some of St. Joe's customers for corroding lead specify Bunker Hill lead and some specify Doe Run lead, but most do not specify either brand.

63. Both Bunker Hill and St. Joe produce and sell primary common lead.

64. Herculaneum lead produced by St. Joe is common lead. St. Joe did not make Herculaneum lead during the period 1941-1953 because St. Joe was able during these years to sell its entire production of lead as Doe Run (corroding) and chemical lead which are sold by St. Joe at a premium of $2 a ton over the common lead price.

65. Bunker Hill and St. Joe are competitors in the sense that they sell the same products.

Operations Under the St. Joe-
Bunker Hill Contracts—
General

66. Under the St. Joe-Bunker Hill contracts St. Joe has received from Bunker Hill corroding lead, common lead, and some caulking lead and some antimonial lead. St. Joe has never produced caulking lead. Originally St. Joe produced only chemical lead but later on it refined chemical lead to make a very pure grade of corroding lead (Doe Run) and still later on it produced some common desilverized lead from its chemical lead.

67. During the period 1935-1949, St. Joe marketed for Bunker Hill approximately 63 per cent of the primary lead produced by Bunker Hill.

A. The 1922 St. Joe-Bunker Hill contract.

68. Under the 1922 contract between Bunker Hill and St. Joe, St. Joe purchased the lead outright from Bunker Hill and the sales price at which St. Joe sold Bunker Hill lead was very largely determined by St. Joe.

B. The 1926 St. Joe-Bunker Hill contract.

69. Under the terms of the contract between Bunker Hill and St. Joe executed on December 14, 1926, St. Joe also pur-

chased the lead outright from Bunker Hill. However, Bunker Hill regarded St. Joe as a "salesman" for selling Bunker Hill lead in the East.

C. Bunker Hill's consideration of direct sales in the East at the time of the 1932 St. Joe-Bunker Hill contract.

70. Bunker Hill has a sales organization in San Francisco.

71. About 1931–1932 when lead prices were down and sales were poor, Bunker Hill considered selling lead in the East through its own sales organization.

72. In December of 1932, Stanly Easton, Manager of Bunker Hill, requested Clinton Crane, President of St. Joe, to release Bunker Hill from confining its pig lead sales west of the 95th meridian and to permit Bunker Hill to sell its surplus lead anywhere to anybody. Crane declined to grant this request. At this time Bunker Hill contemplated establishing its own sales organization in New York, St. Joe was taking only 3,000 tons of Bunker Hill lead per month with the result that Bunker Hill was stocking and carrying lead at its smelter and refinery at Kellogg, Idaho, which could not be disposed of by Bunker Hill. The matter was resolved when St. Joe agreed to prorate its sales of lead between Bunker Hill production and St. Joe production on a 1–2 basis, St. Joe to sell one ton of Bunker Hill lead to every two tons of St. Joe lead. This arrangement continued in effect until market conditions improved.

73. In recent years Eagle-Picher Co. of Cincinnati, Ohio, sought to buy Bunker Hill lead direct from Bunker Hill instead of through St. Joe, without success.

D. The 1936 St. Joe-Bunker Hill contract.

74. In 1941, during the term of the 1936 contract, Bunker Hill classified St. Joe as "sales agent" of Bunker Hill for that portion of the United States east of the 95th meridian. Other Bunker Hill sales agents were F. A. Hammersmith for California and Northwest Lead Co. for Washington and Oregon. Sales in the remaining part of the United States were made direct by Bunker Hill's office at Kellogg, Idaho.

E. The 1944 St. Joe-Bunker Hill contract.

75. The 1944 St. Joe-Bunker Hill contract was designated an "Agency Agreement", but the contract did not differ fundamentally from the predecessor contract. Since 1944 each of the successive St. Joe-Bunker Hill contracts has been designated an "Agency Agreement".

Failure of St. Joe To Compete With Bunker Hill West of The 95th Meridian

76. The major consuming centers for pig lead in the United States are New York, Chicago, Philadelphia, Baton Rouge, Houston, and St. Louis. Other large lead-consuming areas are Detroit, Cleveland, Baltimore, Boston, Pittsburgh, San Francisco, Buffalo, Cincinnati, Seattle, Los Angeles, Atlanta, Dallas, and Charleston, West Virginia.

77. Texas is a very important lead consuming area, and in this area Bunker Hill sells lead on the basis of the New York price.

78. As early as 1953 Houston, Texas, was one of the six major consuming centers for pig lead in the United States. Apart from the major consuming centers, Dallas, Texas; San Francisco and Los Angeles, California; and Seattle, Washington, were four of thirteen other large lead-consuming areas in the United States at this time.

79. Approximately 20 percent of the lead consumed in the United States is consumed west of the 95th meridian.

80. Bunker Hill has its own sales force that sells lead west of the 95th meridian.

81. Bunker Hill has salesmen who cover all areas west of the 95th meridian where sales are a possibility, and who also travel east of the 95th meridian but not to sell lead for delivery to points east of the 95th meridian.

82. Bunker Hill's competitors in the sale of pig lead west of the 95th meridian are ASR, C. Tennant, Sons & Co. repre-

senting Broken Hill Associated Smelters (Proprietary Limited), Anaconda, and Consolidated Mining and Smelting Co. of Canada.

83. St. Joe does not compete with Bunker Hill in the sale of pig lead west of the 95th meridian. When St. Joe received orders for lead to be shipped to points west of the boundary line provided by the St. Joe-Bunker Hill contracts, such orders were referred to Bunker Hill. In some unusual circumstances Bunker Hill has permitted St. Joe to sell Bunker Hill lead in the western territory reserved to Bunker Hill under the contract.

84. On a tonnage basis a large number of St. Joe's customers east of the 95th meridian have pig lead consuming plants west of the 95th meridian.

85. During the period 1922–1958, inclusive, St. Joe's sales of St. Joe lead west of the boundary provided by the St. Joe-Bunker Hill contracts were insignificant from a competitive standpoint and in fifteen of these years St. Joe made no sales at all of St. Joe lead west of the boundary, as shown by the table, Government's Trial Exhibit 135, which is incorporated by reference.

86. Most of the sales of St. Joe lead west of the 95th meridian shown on the table were sales of chemical lead. From 1932 to 1959 St. Joe's largest sales of lead west of the 95th meridian for any one year were 110 tons in 1957. This tonnage was chemical lead. In 1959 St. Joe made substantial deliveries of corroding lead to the Ethyl Corporation for its Houston plant, with the purchaser taking delivery of the lead at Herculaneum on its own barges.

87. Bunker Hill produces about 75 tons of chemical pig lead each year which it uses in the fabrication of certain manufactured lead goods items. Bunker Hill does not sell chemical pig lead as such. For the purpose of producing chemical pig lead Bunker Hill buys corroding grade lead from Consolidated Mining and Smelting Company in Trail, British Columbia, and adds copper to this lead. Bunker Hill's corroding lead is too high in bismuth for use in making chemical lead.

88. St. Joe does not have salesmen who travel west of the 95th meridian soliciting orders for shipment of lead west of the 95th meridian.

89. Bunker Hill sells pig lead at Houston and Dallas, Texas; Omaha, Nebraska; Tulsa, Oklahoma; Wichita, Kansas.

90. While St. Joe claims that St. Joe's failure to sell St. Joe lead in substantial quantity west of the boundary provided by the St. Joe-Bunker Hill contracts is because of prohibitive freight rates, it is apparent that there are many points west of the 95th meridian to which the freight is lower from St. Joe's refinery at Herculaneum, Missouri, than from Bunker Hill's refinery at Kellogg, Idaho; e. g., Sioux City, Iowa; Topeka, Kansas; Lincoln, Omaha and Platt's Mouth, Nebraska; Tulsa, Oklahoma; and Dallas and Houston, Texas. (Bunker Hill had sold lead to most of these points prior to the original 1922 St. Joe-Bunker Hill contract.)

91. There are points west of the 95th meridian to which the carload lot freight rate for pig lead from Kellogg is higher than it is from Kellogg to some points east of the 95th meridian; e. g., Houston and Dallas, Texas (west), and St. Paul, Minnesota (east).

92. St. Joe sells Bunker Hill lead along the Atlantic Seaboard at Boston, Massachusetts; Trenton and Perth Amboy, New Jersey; New York City; Philadelphia, Pennsylvania; Baltimore, Maryland; Norfolk and Richmond, Virginia; Atlanta, Georgia; and Jacksonville, Florida.

93. During the past eight years it has been cheaper to ship lead by rail from Kellogg, Idaho, to New York City than by rail to Seattle and by water from Seattle to New York. The in-transit time is less by rail.

94. St. Joe ships Bunker Hill lead to many points in the East to which the freight rate from Kellogg, Idaho, is higher than the freight rate from Hercula-

neum, Missouri, to San Francisco, Los Angeles and Seattle in the West; e. g., Jacksonville, Florida; Atlanta, Georgia; Baltimore, Maryland; Boston, Massachusetts; Perth Amboy and Trenton, New Jersey; New York City; Philadelphia, Pennsylvania; and Richmond, Virginia.

95. One reason why St. Joe does not make substantial sales of lead west of the 95th meridian is that such sales would detract from sales by Bunker Hill in this territory. Under these circumstances Bunker Hill could declare a larger amount of its lead for sale by St. Joe east of the 95th meridian.

96. The current St. Joe-Bunker Hill contract, dated November 18, 1955 and effective January 1, 1956, provides for the exchange of information between the parties as follows:

(A) The Producer and the Agent shall, to the best of their ability, keep each other advised as to market conditions of the refined products covered by this Agreement, with special emphasis on apparent changes and trends that might affect their respective planning.

(B) There will be free interchange of information between the Producer and Agent concerning their respective productions, sales and inventories, and each will supply to the other all figures necessary to the proper administration of this Agreement and the accounting thereof.

(C) The Producer shall have the right to examine at all reasonable times the Agent's records of all sales of lead as far as they affect in any way the provisions of this Agreement.

### Failure of Bunker Hill To Sell Its Fabricated Products East of The 95th Meridian

97. St. Joe has a policy of not competing with its customers by selling the lead product which they manufacture in competition with them.

98. Bunker Hill does not have a policy of not competing with its customers, and does not have a policy of not competing with certain of St. Joe's customers who also have plants west of the 95th meridian.

99. As shown on the last page of Bunker Hill's Annual Report for 1958 (which was disseminated not only to Bunker Hill's stockholders but also to its customers,) the sales territory of Bunker Hill's "Sales and Fabrication Division", which markets both the primary lead produced by Bunker Hill at Kellogg and the fabricated lead products produced by Bunker Hill at Seattle, Washington, extends from the West Coast to but not beyond the 95th meridian in the United States.

100. For many years a page similar to the last page of Bunker Hill's Annual Report for 1958 has been appearing in Bunker Hill's annual reports.

101. Bunker Hill sends a copy of its Annual Report to each and every one of its good customers.

102. Bunker Hill has been sending copies of its Annual Report to its customers both in the East and the West for many years.

103. If Bunker Hill sold its fabricated lead products east of the 95th meridian, it would be selling in competition with St. Joe's customers who purchase lead from St. Joe.

### Anti-Competitive Effects of The St. Joe-Bunker Hill Contract

104. Both under the St. Joe-Bunker Hill purchase contracts from 1922 to 1944 and under the "agency" contracts from 1944 on, St. Joe has decided the price at which St. Joe sold Bunker Hill lead in the eastern part of the United States. Bunker Hill has never named the price at which Bunker Hill lead is to be sold east of the 95th meridian by St. Joe, and St. Joe sells Bunker Hill lead at the same price as St. Joe lead.

105. St. Joe has been the leader in announcing price changes on an average of about once a year during the past twenty years. On these occasions ASR has followed St. Joe's changes.

106. St. Joe has never declined to follow a price rise of ASR.

107. St. Joe has never initiated a decline in the price of lead.

108. Since the contract of 1922, St. Joe has sold both the Bunker Hill and the St. Joe brands of corroding lead at the same price.

109. Giving effect to the silver content in Bunker Hill ores, Bunker Hill's over-all costs of producing corroding grade lead were less than St. Joe's costs of producing Doe Run lead.

110. The existence of the St. Joe-Bunker Hill contract has prevented Bunker Hill, with lower production costs, from competing with St. Joe and thereby lowering the price of lead. If the contract were terminated and if Bunker Hill sold its own lead in the East and lowered the premium on corroding grade lead, St. Joe would have to lower its premium.

111. St. Joe has protected the premium prices obtained for Bunker Hill corroding grade lead and has treated Bunker Hill lead as equal grade with the Doe Run lead produced by St. Joe.

112. If St. Joe did not sell Bunker Hill lead, St. Joe would make additional Doe Run lead which would compete with Bunker Hill lead and thereby lessen the tonnage upon which Bunker Hill could receive a premium over the price of common lead.

113. If the St. Joe-Bunker Hill contract were terminated, Bunker Hill would have to compete with St. Joe in the sale of lead and the tonnage of corroding lead on which Bunker Hill could obtain a premium over the common lead price might be reduced.

114. Willard Storage Battery Co., a storage battery manufacturer, buys Bunker Hill lead from both St. Joe and Bunker Hill for use in the manufacture of lead oxide for storage batteries. Willard's East Coast plants purchase lead from St. Joe and Willard's West Coast plants purchase lead from Bunker Hill. St. Joe has advised Bunker Hill as to the price to charge Willard on the West Coast.

115. Both St. Joe and Bunker Hill are stocking lead at the present time substantially in excess of their normal inventories, and the amount stocked by each is taken into account in determining what percentage of St. Joe's total sales Bunker Hill is entitled to receive under the current St. Joe-Bunker Hill contract.

116. Since the latter part of 1957 St. Joe has not been able to sell all of its own production of lead.

117. When the lead supply is greater than the demand St. Joe gives to Bunker Hill a part of the lead sales which St. Joe is able to make.

118. Insofar as St. Joe has been selling Bunker Hill lead and thereby displacing St. Joe lead, less efficiency in St. Joe's production of lead has resulted than if St. Joe has produced the maximum St. Joe lead it could and sold the maximum on the market.

119. In the event that St. Joe, for business reasons, found it necessary to sell all the lead it could produce, it would cancel the contract with Bunker Hill.

120. If lead prices rise to the 1953 level, St. Joe can expand its refining facilities at Herculaneum.

121. The 1950 St. Joe-Bunker Hill agreement for the first time provided for the averaging of freight expenses on the sale of St. Joe and Bunker Hill lead east of the 95th meridian. Under previous contracts Bunker Hill was never quite satisfied that it was receiving its fair share of middlewestern destinations, which area takes a lower freight rate from Kellogg than from Kellogg to easternmost destinations. Bunker Hill was anxious to obtain a fair division of the desirable freight areas and insisted that freight rates be averaged.

122. If the agency agreement were terminated St. Joe and Bunker Hill both would endeavor to sell lead east of the 95th meridian at the most advantageous freight points, thus causing them to attempt to sell lead to the same customers in the same area.

123. Consumers of lead desire to buy lead at the lowest prices for any period of time, and they are interested in multiple competitive sources of supply.

124. If the St. Joe-Bunker Hill contract is terminated and if Bunker Hill sets up its own sales agency in the East it may have to lower prices in order to attract customers. As early as 1926 Bunker Hill recognized that if necessary because of antitrust objections, Bunker Hill could discontinue selling its lead through St. Joe in the East and establish its own selling agency in New York. However, Bunker Hill did not wish to establish its own selling agency because in that event Bunker Hill would have to compete on the open market with other lead-selling concerns and sell its lead at the going price whatever it might be.

### Price Policies of St. Joe and Bunker Hill

125. It is against St. Joe policy to cut the price of lead.

126. St. Joe and Bunker Hill, acting together, have pursued a policy of withholding both Bunker Hill and St. Joe lead from the domestic market when necessary to prevent a decline in the price of lead.

127. Bunker Hill sometimes substitutes corroding grade lead for common lead and sells the corroding grade lead at the common lead price.

128. Every month Bunker Hill sells corroding grade lead at the common lead price to the Electric Storage Battery Company and the Electric Auto-Lite Company.

129. The only two battery companies to which Bunker Hill sells corroding grade lead at the common lead price are the Electric Storage Battery Co. and the Electric Auto-Lite Company.

130. Bunker Hill marks with a "C" each of its pigs that meets corroding grade lead specifications of ASTM, and corroding grade lead sold by Bunker Hill at the common lead price to the Electric Storage Battery Co. and to the Electric Auto-Lite Company is so marked.

131. Other manufacturers of lead oxides for batteries to whom Bunker Hill sells corroding grade lead, but not at the common lead price, are Delco-Remy Division of General Motors, Standard Electric, and a number of oxide makers who supply battery oxides to the smaller battery manufacturers, these oxide makers being mainly National Lead Co., Western Lead Co. and Eagle-Picher Co.

### Power of St. Joe and Bunker Hill To Affect Lead Prices

132. St. Joe and ASR, both collectively and separately, have possessed the power to affect and at times to control the price of lead in the United States.

133. Lead is sold on a delivered price basis and consumers receive no price advantage by reason of being located adjacent to a lead refinery.

134. The Engineering and Mining Journal (hereinafter referred to as E&MJ) publishes weekly in New York an average daily price in cents per pound for common lead delivered New York and an average daily price for common lead delivered in St. Louis. These averages are weighted averages based on the prices at which lead has been sold by the reporting companies and the quantities sold at each price. E&MJ also publishes weekly average prices for lead and monthly average prices for lead which are arithmetical averages of the daily prices.

135. The average New York and St. Louis daily prices for lead published by E&MJ are based on prices reported by only four companies: ASR, St. Joe, United States Smelting, Refining and Mining Co., and Anaconda. The prices are obtained once a week, ordinarily on Wednesday mornings, from the reporting companies by a representative of E&MJ.

136. As indicated, besides ASR and St. Joe, only two other companies, United States Smelting, Refining and Mining Company and Anaconda, report their lead sales prices to E&MJ. United States Smelting, Refining & Mining Company sells only about 48,000 tons of lead a year, and in recent years Anaconda has sold only about 2,500 tons of lead a month of 30,000 tons a year. The lead which Anaconda sells is refined for it by ASR under a toll contract.

137. The four reporting companies report to E&MJ all their domestic sales of pig lead at flat prices sold for delivery within three months of the selling date.

138. St. Joe reports Bunker Hill's sales east of the 95th meridian to E&MJ. Bunker Hill's sales west of the 95th meridian are not reported.

139. ASR's sales reported to E&MJ include its West Coast sales.

140. ASR's reported sales to E&MJ include its sales of imported pig lead.

141. The American Metal Company and C. Tennant, Sons and Co., both importers of pig lead, do not report their sales prices to E&MJ.

142. The American Metal Company's sales of lead in the United States are not reported to E&MJ because it is not an owner of a plant producing lead in the United States.

143. Since the American Metal Company does not have lead producing facilities in the United States its business is subject to more fluctuation than that of other domestic producers of land.

144. The American Metal Company makes regular sales of lead in the United States.

145. Like the American Metal Company, C. Tennant, Sons and Co. does not report its lead sales to E&MJ since it is an agent for foreign lead firms rather than a domestic producer of lead.

146. Future dealings in lead for purposes of arbitrage or hedging are not reflected in the prices quoted in E&MJ.

147. As a matter of normal procedure sales records of the reporting companies are not checked by E&MJ.

148. Only rarely are records of the reporting companies examined by any representative of E&MJ.

149. E&MJ has no sanctions to enforce the accurate reporting of sales by the reporting companies.

150. The consumer is not specified in the reports furnished to E&MJ by the reporting companies.

151. All sales prices reported to E&MJ are first adjusted to a common lead basis by the four reporting companies. In the case of corroding lead the reporting companies deduct from the price actually charged for the lead whatever premium they may have charged over the common lead price.

152. E&MJ does not see the actual price at which corroding grade lead is sold, since the reporting companies first convert all sales to a common lead basis.

153. All sales prices reported to E&MJ, regardless of the location of the sales, are first adjusted to either a St. Louis price basis or a New York price basis by the four reporting companies.

154. E&MJ does not check to see whether the conversion is appropriate but leaves it up to the reporting companies to determine what sales are reported on a St. Louis basis and what sales are reported on a New York basis.

155. ASR reports all of its domestic sales to E&MJ on the basis of the New York price, including its West Coast sales which are made at the same price as the St. Louis price, and even including its sales for delivery at St. Louis.

156. The two major markets for refined lead in the United States are New York and St. Louis, and the bulk of domestically produced lead is sold at prices normally based upon quotations in these markets. The St. Louis price is 0.2 cent a pound lower than the New York price. Quotations are for common lead.

157. St. Joe is the principal seller of lead in the St. Louis area and announces the changes in the St. Louis lead price which is always .2 of a cent a pound lower than the New York price.

158. St. Joe keeps the St. Louis lead price under the New York lead price to encourage Western producers and the Consolidated Mining and Smelting Co. of Canada to ship east instead of selling their lead in Chicago and the Mid-West.

159. The freight cost to Bunker Hill is $9 a ton more to ship lead from Kel-

logg, Idaho, to New York than to ship from Kellogg to St. Louis.

160. The St. Louis lead price prevails at Kansas City, Joplin, and Olatbe, Kansas.

161. The Boston lead price is $1.50 per ton higher than the New York lead price.

162. In New England, lead is sold by the reporting companies at the Boston price.

163. The lead price at Chicago, Milwaukee, St. Paul, and Minneapolis is $3 a ton less than the New York lead price.

164. The lead price at Cleveland and Cincinnati is the New York lead price.

165. There are points closer freightwise to St. Louis than New York where lead is nevertheless sold on the basis of the New York price, e. g., Indianapolis, Indiana.

166. Indianapolis is the farthest point west between New York and St. Louis where lead is sold on the basis of the New York price.

167. All points east of the Mississippi are sold at the New York lead price (or at a differential therefrom) with the exception of Alton, Illinois, which is just across the river from St. Louis and which takes the St. Louis price.

168. Lead is sold in Texas at the New York price.

169. Bunker Hill sells lead at Wichita, Kansas, (west of the 95th meridian) on the basis of the St. Louis price and at Denver on the basis of the New York price.

170. Bunker Hill sells lead on the West Coast at the St. Louis price.

171. ASR's West Coast lead price is the same as the St. Louis lead price.

172. While St. Joe sets the differential between the New York lead price and the St. Louis lead price for St. Louis (0.2 of a cent a pound lower at St. Louis), ASR sets the differential between the New York price and the price at all other points that do not take either the St. Louis price or the New York price.

173. St. Joe's sales of lead based on average price contracts related to E&MJ average prices have ranged from approximately 40 to 45 per cent to ⅔ of St. Joe's total sales.

174. In 1958 St. Joe sold ⅔ of the pig lead which it marketed on average price contracts based upon the average prices reported by E&MJ.

175. On a rising market St. Joe's sales of pig lead on an average price basis have been 40 to 45 per cent of St. Joe's total sales.

176. West of the 95th meridian Bunker Hill sells its lead on the basis of the E&MJ monthly quotation or on a spot basis.

177. Approximately 30 per cent of Bunker Hill's lead sales west of the 95th meridian are made on average price contracts based on E&MJ quotations.

178. If Bunker Hill sold its own lead in the East, E&MJ would obviously endeavor to obtain reports from Bunker Hill to enter into E&MJ's compilation of average prices.

179. Custom smelters buy ores and concentrates from miners on the basis of E&MJ average prices.

180. The E&MJ price is the price on the basis of which ores and concentrates are sold by miners to ASR.

181. The lead concentrate purchase contracts entered into between ASR and independent lead-miners specify that ASR will pay for the concentrates on the basis of the average prices reported in E&MJ for the week following arrival of the concentrates at the smelter or the month following arrival, or the month of arrival.

182. In some years ASR sells more lead on average price contracts than it does at flat prices and in other years the reverse is true.

183. All principal sellers of lead sell some lead on an average price basis.

184. For many years E&MJ's published average prices for lead have been followed by this quotation:

Quotations for lead are based on domestic common lead. Corroding

lead commands a premium of 10 points (almost all U. S. lead is corroding grade).

185. If a single reporting company did not charge a $2 a ton premium on corroding grade lead E&MJ would modify the statement with respect to the premium of 10 points on corroding grade lead.

186. E&MJ also publishes London Metal Exchange quotations for lead on a daily basis. These prices are in pounds sterling per ton of 3240 lbs. for lead 99.97% pure. In contrast with United States prices, there is no separate uniform premium on the London Metal Exchange for corroding grade lead as distinguished from common lead.

### Foreign Territorial Restrictions of The St. Joe-Bunker Hill Contracts

187. In July of 1930 St. Joe, at the request of ASR, requested Bunker Hill not to offer Bunker Hill bonded lead for shipment to Japan. At this time ASR and the Consolidated Mining and Smelting Co. of Canada were selling lead in the Orient and St. Joe was fearful that sales by Bunker Hill in the Orient would upset the London price for lead and in turn the domestic price would be affected. Bunker Hill complied with St. Joe's request not to sell in the Orient. Under the contract in effect at this time between Bunker Hill and St. Joe, Japan was a part of the territory reserved to Bunker Hill.

188. As a result of the participation of Clinton Crane, President of St. Joe, in a conference of the world producers of lead held in London in 1930 for the purpose of dividing world markets and stabilizing prices, St. Joe refrained from selling Bunker Hill bonded lead in Europe at this time.

189. In 1931 Clinton Crane, President of St. Joe, requested Bunker Hill to decline to smelt lead ore for the Consolidated Mining and Smelting Co. of Canada. Crane stated that there had been a falling out among the principal world producers and that Consolidated

expected to increase its production at once. Crane was fearful that Consolidated's increase in production might result in a drop in the domestic U. S. price. After the receipt of Crane's request, F. W. Bradley, President of Bunker Hill, advised Frank M. Smith, Bunker Hill's Smelter Director, not to permit Consolidated to smelt any of their lead ore at Kellogg.

190. In 1932 St. Joe limited its sales of Bunker Hill lead in the Orient to 500 tons a month in order not to upset the price structure.

191. Under the contracts between St. Joe and Bunker Hill in effect from 1922 to 1932 the Orient was part of the territory reserved to Bunker Hill. However, the new contract executed by St. Joe and Bunker Hill in 1932 allocated the Orient to St. Joe. Prior to 1932, Bunker Hill sold some lead to the Orient through F. A. Hammersmith, its West Coast agent, and also on occasion permitted St. Joe to sell Bunker Hill lead to the Orient. In 1932, the new contract between St. Joe and Bunker Hill for the first time allocated the Orient exclusively to St. Joe because Bunker Hill did not wish two agencies to compete with each other in the sale of Bunker Hill lead and Bunker Hill's West Coast agent was not as familiar with foreign prices as St. Joe and on occasion had sold lead to the Orient under the market price. In all the St. Joe-Bunker Hill contracts since 1932 the Orient has been a part of the territory allocated to St. Joe. But neither St. Joe nor Bunker Hill has exported lead since 1941 and practically no lead has been exported from the United States since 1944.

### Related Aspects of The St. Joe-Bunker Hill Relationship

192. In 1932 Ernest Hothorn of the American Metal Company called Irwin Cornell, Vice President and Sales Manager of St. Joe, and offered to sell St. Joe 600 tons of Bunker Hill lead at the current price of $3.60 per pound and indicated that if the American Metal Company was unable to sell this lead at the

current price the American Metal Company would cut the price. In order to hold up the price and to prevent the American Metal Company from cutting the price, Cornell arranged for the National Lead Co. to buy the 600 tons of Bunker Hill lead from the American Metal Company with the promise that St. Joe would buy an equivalent amount of lead from the National Lead Company at a later date if the National Lead Company so desired. Later St. Joe bought back 500 tons of lead from the National Lead Company at a price per ton substantially higher than the price per ton at which the National Lead Company had purchased the 600 tons.

193. Arsenical antimonial lead is sold by St. Joe for Bunker Hill on a commission basis. Arsenical antimonial lead is an alloy made by Bunker Hill but not by St. Joe, and is used by ammunition manufacturers for shot. In February 1932, A. F. Beasley, Smelter Superintendent of Bunker Hill, and Charles R. Ince, then Assistant Sales Manager of St. Joe, contacted the Remington Arms Company and the Winchester Arms Company in Connecticut and these companies agreed to buy a part of their arsenical antimonial lead requirements from Bunker Hill and St. Joe. Later the National Lead Company objected to the sale of Bunker Hill arsenical antimonial lead in this territory (Connecticut) and as a result of this objection Bunker Hill and St. Joe refrained from selling Bunker Hill arsenical antimonial lead to Remington and Winchester. The National Lead Company purchases lead from St. Joe and processes this lead to make arsenical antimonial lead. If St. Joe had sold Bunker Hill arsenical antimonial lead to Remington and Winchester, St. Joe would have been in competition with its customer, the National Lead Company. It is the general policy of St. Joe not to compete with its customers and whenever a customer of St. Joe has objected to St. Joe making a sale, either of its own lead or Bunker Hill lead, St. Joe has refrained from selling the lead in competition with its customer.

194. In 1933, Bunker Hill and St. Joe entered into an informal agreement, outside of their written contract, whereby the two companies prorated their lead sales on the basis of the whole United States market. Under the terms of this agreement Bunker Hill was prohibited from making more than about 20 per cent of total U. S. domestic lead sales.

195. Under this informal 1933 agreement between Bunker Hill and St. Joe, Bunker Hill could sell about 50 per cent of its production and stocked the rest. This arrangement continued for several years during the depression when lead prices were low.

196. In 1934 St. Joe advised Bunker Hill as to the price to charge the City of Dallas, Texas, for Bunker Hill lead. Bunker Hill followed St. Joe's price.

197. In 1935 St. Joe advised Bunker Hill as to ASR's pig lead prices at San Francisco, which prices were obtained by St. Joe from ASR and and used by Bunker Hill for the purpose of regulating its West Coast sales.

198. In 1938 Bunker Hill encouraged its West Coast sales representative to confer with ASR officials for the purpose of eliminating price concessions to customers and maintaining a stabilized price structure in San Francisco.

199. During periods of shortage Bunker Hill has restricted its sales of lead in the West in order to have more lead for shipment to St. Joe's customers in the East.

200. In 1941, at the request of St. Joe, Bunker Hill agreed to cut down on its sales of Bunker Hill lead on the West Coast from current sales of almost 2,500 tons a month to a maximum of 1,500 tons a month in order to have more lead for shipment to St. Joe's customers in the East.

201. Ingot lead is a semi-fabricated lead sometimes referred to as caulking lead. Ingot lead is small ingots, melted down from pig lead, weighing about 5 pounds each, usually not more than 50 to a bar, for ease in carrying by a plumber. The ingot lead is used for caulking

pipe joints. Bunker Hill makes ingot lead but St. Joe does not.

202. In November 1941, Stanly A. Easton, President of Bunker Hill, held a conference in New York City with Irwin H. Cornell, Vice President and Sales Manager of St. Joe, at which time they decided to increase the price of caulking (ingot) lead from $5 per ton over the common lead price to $10 per ton over the common lead price. Caulking lead was not covered by the St. Joe-Bunker Hill contract, but St. Joe at this time was selling caulking lead for Bunker Hill. However, the St. Joe-Bunker Hill contract executed November 29, 1941, and effective January 1, 1942, covered caulking lead as did all subsequent contracts.

203. St. Joe has not pushed the sale of Bunker Hill's caulking lead in the East because of St. Joe's policy of not competing with its customers. Many purchasers of pig lead from St. Joe made caulking lead for resale from the pig lead which they purchase from St. Joe.

204. In February of 1950 Bunker Hill sold lead on the West Coast to Electrict Auto-Lite (an automobile battery manufacturer) on the basis of immediate shipment in February with the price for the lead to be determined by the average price of lead for the following month of March, as reported in the Engineering and Mining Journal. Electric Auto-Lite was also a customer of ASR on the West Coast. ASR learned of the terms on which Bunker Hill sold the lead to Electric Auto-Lite and in February of 1950 Simon D. Strauss, ASR's Vice President in Charge of Sales, asked Charles R. Ince, St. Joe's Vice President in Charge of Sales, to find out from Bunker Hill if Bunker Hill had sold lead to Electric Auto-Lite in the West on the basis of immediate shipment in February with the price to be determined by the average price for the following month of March. As a result, Ince contacted Bunker Hill and Bunker Hill agreed not to make any further sales on this basis. Ince advised Strauss that Bunker Hill admitted making the sale on the basis of immediate shipment in February with the price to be determined by the average price for March, but that Bunker Hill claimed that this was done because of Electric Auto-Lite's representation that this was the only way Bunker Hill could get the business. Ince further advised Strauss that Bunker Hill claimed that the sale to Electric Auto-Lite was the only sale Bunker Hill had made on the basis of immediate shipment but March average. Ince also advised Strauss that he had pointed out to Bunker Hill that its practice in the case of Electric Auto-Lite could only lead to "very undesirable consequences" and that Bunker Hill agreed not to make any further sales on the same terms. Both ASR and St. Joe sell to Electric Auto-Lite in the eastern part of the United States but St. Joe does not sell to Electric Auto-Lite in the western part of the United States. St. Joe sells both Bunker Hill lead and St. Joe lead to Electric Auto-Lite in the East.

### The Relative Position of St. Joe and Bunker Hill In The Lead Industry

205. In 1924 St. Joe was (and still is) the largest miner of lead in the United States and Bunker Hill was (and still is) the second largest.

206. In 1924 the combined total of Bunker Hill lead plus St. Joe lead represented over 50 per cent of the total U. S. production of lead of domestic origin.

207. For the period 1922–1933, the combined production of lead by Bunker Hill and St. Joe was approximately 66 per cent of the total domestic lead production of the United States, and their individual percentages of the total United States lead production were as follows:

| | Per cent of Total U.S. |
|---|---|
| From Bunker Hill mine | 12 |
| Bunker Hill smelter custom production | 12 |
| Total Bunker Hill | 24 |
| St. Joe | 42 |
| Combined Bunker Hill and St. Joe | 66 |

208. In 1933 St. Joe's and Bunker Hill's combined production of lead was more than one-half of the total domestic production.

209. Government's Trial Exhibit 119, which is hereby incorporated by reference, reflects St. Joe's and Bunker Hill's mine production of lead as a per cent of the United States total mine production of lead for the years 1951–1957, inclusive. It appears that the average St. Joe mine production during this period was 32.3 per cent of the total, Bunker Hill mine production averaged 7.9 per cent and the aggregate St. Joe and Bunker Hill mine production averaged 40.2 per cent of the United States total mine production.

210. The following table sets forth the location and capacity of the primary lead refineries of the United States as of December 31, 1958:

### Smelters and refiners of Missouri lead (b)

| Company | Situation of Works | Annual Capacity, pig lead |
|---|---|---|
| American Smg. & Ref. | Federal, Ill. | 128,000 |
| St. Joseph Lead Co. | Herculaneum, Mo. | 120,000 |
| Total | | 248,000 |

(b) The smelting and refining of Missouri lead ore is done in the same plant. The smelting is of a high grade of galena concentrates, which is generally of low silver content, and most of the lead is now desilverized by St. Joseph Lead Company.

### Silver-lead refiners (a)

| Company | Situation of Plant | Annual Capacity for refined lead |
|---|---|---|
| American Smg. & Ref. | Selby, Calif. | 72,000 |
| American Smg. & Ref. | Barber, N. J. | 96,000 |
| American Smg. & Ref. | Omaha, Nebr. | 180,000 |
| Bunker Hill Smelter | Bradley, Idaho | 100,000 |
| U.S.S. Lead Refinery | East Chicago, Ind. | 40,000 |
| Total | | 488,000 |

(a) Most of this refining is done by the Parkes process, but the electrolytic process is used by U.S.S. Lead Refinery at East Chicago.

———◆———

ASR's refinery at Federal, Illinois, is being closed down as a result of the recent cancellation by St. Joe of its smelting contract with ASR, effective July 1, 1959. The refinery of the U. S. Smelting, Refining & Mining Co. located at Midvale, Utah, has not been in operation for some years.

211. Government Trial Exhibit 120, which is hereby incorporated by reference, reflects St. Joe's and Bunker Hill's production of primary refined lead as a per cent of the United States total production of primary refined lead for the years 1951–1957, inclusive. It appears that the average St. Joe refined lead production during this period was 16.0 per cent of the total; that ASR production of refined lead for St. Joe averaged 9.9 per cent, with the total production by or

for St. Joe averaging 25.9 per cent; that Bunker Hill smelter primary lead production averaged 15.7 per cent; and that the aggregate St. Joe and Bunker Hill production averaged 41.6 per cent of the total United States production of primary lead.

212. The American Smelting & Refining Co. and the St. Joseph Lead Co. are the principal sellers of primary refined lead in the United States. These two companies market roughly one-half to three-fourths of all such lead, depending upon the quantity being imported.

213. In addition to ASR and St. Joe, other important sellers of primary refined lead in the United States are: The American Metal Co., Ltd.; The Bunker Hill Company (in or about August 1956 Northwest Lead Co. was merged with Bunker Hill); C. Tennant, Sons & Co.; Anaconda Sales Co.; United States Smelting, Refining & Mining Co.; and the Yugoslav Government.

214. Government's Trial Exhibit 118, pp. 8–1, 8–2, discloses St. Joe's sales of pig lead (in tons), (1) produced by it, and (2) purchased lead (including Bunker Hill lead), for the years 1914 to 1957, inclusive. These figures (year and "Pig Lead Sales St. Joe Production" column on page 8–1, year and "Purchased Lead" columns on page 8–2) are incorporated by reference.

215. Government's Trial Exhibit 126 reflects St. Joe's and Bunker Hill's sales of lead as a per cent of the United States total production of lead from ores and concentrates from the years 1950–1957. It appears from this exhibit that St. Joe's sales during this period averaged, for itself, 26.36 per cent of the total, and for Bunker Hill 9.6 per cent, the combined average being 35.9 per cent. Bunker Hill's sales for itself averaged 5.55 per cent of the total. The aggregate St. Joe and Bunker Hill sales averaged 41.52 per cent of the United States total production.

216. Defendants' Exhibit 62 reflects St. Joe's production of lead by brands and grades for the years 1915 to 1957, inclusive, and is incorporated by reference. The table discloses that St. Joe commenced producing corroding grade (Doe Run) lead in 1918 and continued to produce it over the years in small amounts compared to its chemical lead production, until about 1950, when its Doe Run production almost equalled its chemical lead production, and since 1954 its corroding grade production has substantially exceeded its chemical lead production.

217. Defendants' Exhibit 63 reflects Bunker Hill's production of lead by grades for the years 1922 to 1958, inclusive, and is incorporated by reference. The table discloses that production of corroding grade lead vastly exceeded the production of common lead, caulking lead and antimonial lead. Bunker Hill records for the years 1922–1931, inclusive, do not reflect an adequate breakdown for "soft pig lead" between corroding and common, but substantially all of Bunker Hill's production during this period was corroding grade lead. The term "soft pig lead" as used in the table is not to be confused with the type of lead designated as "soft lead" by the ASTM Tentative Specification for refined secondary lead which has different specifications from the Standard Specifications for Pig Lead. And a part of the Bunker Hill "common lead" shown on the table meets ASTM specifications for corroding grade lead.

218. Defendants' Exhibit 65 reflects sales, by grade, of Bunker Hill lead by St. Joe, and Bunker Hill's other sales of lead for the years 1922–1958, inclusive, and is incorporated by reference. The table discloses that sales by St. Joe were vastly greater than "other sales", and that the vastly greater part of the St. Joe sales were sales of corroding grade lead. The term "soft pig lead" as used in the table is not to be confused with the type of lead designated as "soft lead" by the ASTM Tentative Specification for refined secondary lead which has different specifications from the Standard Specifications for Pig Lead.

219. Government's Trial Exhibit 121 reflects St. Joe's and Bunker Hill's sales of corroding grade lead as a per cent of

the total domestic sales of corroding grade lead of the companies reporting to Lead Industries Association for the years 1950–1957, inclusive, (reported sales include sales of foreign lead to domestic consumers), and is incorporated by reference. It appears that St. Joe's sales for itself during this period averaged 14.1 per cent of the total, and its sales for Bunker Hill averaged 8.7 per cent of the total, with all of the St. Joe sales averaging 22.8 per cent. Bunker Hill's sales for itself averaged 4.8 per cent, and the aggregate St. Joe and Bunker Hill sales averaged 27.6 per cent of the total. Lead Industries Association estimates that 15 to 20 per cent of foreign pig lead sold in the United States is not reported to it.

220. Government's Trial Exhibit 125 reflects a breakdown by grades of the total lead sales reported to Lead Industries Association for the years 1950–1957, inclusive, and is incorporated by reference. It appears from this table that the sales of corroding grade lead were approximately 60 to 70 per cent of the total sales during the period.

221. Net sales (gross sales less prepaid freight) of Bunker Hill brand lead by St. Joe have ranged from $1,344,249.-92 in 1922 (the first St. Joe-Bunker Hill contract was dated April 28 and provided for the sale of Bunker Hill lead to St. Joe beginning July 1, 1922), to a high of $18,162,508.60 in 1956. In 1957, the most recent year for which the figures are in the record, St. Joe's net sales of Bunker Hill brand lead amounted to $16,-770,980.64.

### The Distinction Between Primary Lead and Secondary Lead

222. The ASTM Standard Specifications for Pig Lead provide for four types of lead: corroding, chemical, acid-copper, and common desilverized, with varying chemical requirements for each type. The specifications further provide that each pig shall be marked in such a way as to identify the manufacturer and the type of lead.

223. The ASTM Tentative Specification for Refined Secondary Lead, adopted by the Society in June 1958, for use pending adoption as standard, provides for two types of refined secondary lead: soft lead and copper-bearing lead, with varying chemical requirements for each. The chemical requirements for soft lead and the chemical requirements for copper-bearing lead also vary from the requirements for the types of lead covered by the ASTM Standard Specifications for Pig Lead. As in the case of the Standard Specifications for Pig Lead, the Tentative Specification for Refined Secondary Lead provides that each pig shall be marked in such a way as to identify the manufacturer, and the type of lead.

224. Government's Trial Exhibit 114, page 75, sets forth the chemical requirements of the ASTM Standard Specifications for Pig Lead for corroding, chemical, acid-copper and common desilverized lead; Government's Trial Exhibit 115, page 708, sets forth the chemical requirements of the ASTM Tentative Specification for Refined Secondary Lead for soft lead and copper-bearing lead. These portions of the exhibits are incorporated by reference.

225. The amount of impurities in lead, which is the factor which determines its grade, has a very important economic significance.

226. Bunker Hill and St. Joe do not use any scrap lead in producing primary lead at their respective refineries at Kellogg, Idaho, and Herculaneum, Missouri.

227. Secondary lead is recovered in the United States at some primary smelters and refineries as refined lead and in antimonial lead and at secondary plants that process scrap to produce refined lead, antimonial lead, and other lead alloys (copper-base, tin-base, and others).

228. Government's Trial Exhibit 112, page 15, reflects a breakdown of secondary lead recovered in the United States as refined metal, in antimonial lead, and in other alloys, for the years 1948–1952 averaged, for each of the years 1953–1957, in short tons. This part of the exhibit is incorporated by reference. It discloses that the principal product of

secondary lead smelters is antimonial lead.

229. Government's Trial Exhibit 113, page 15, reflects lead recovered from scrap processed in the United States, by kind of scrap and form of recovery, 1956–1957, in short tons, and is incorporated by reference.

230. In 1957, the secondary lead recovered in the United States (489,229 tons) exceeded domestic mine production (338,000 tons) for the 12th consecutive year, but was considerably less than the total of 598,255 tons of lead in refined lead (533,533 tons) and antimonial lead (84,722 tons) produced at primary smelters in the United States from domestic and imported primary materials.

231. In addition to refined lead from ores, primary refiners in the aggregate normally market a small amount of refined lead obtained from scrap and about 35,000 tons of antimonial lead. The secondary smelters in turn produce some refined lead; but their products are preponderantly secondary pig metals, including antimonial lead, solder, babbits, and type metal.

232. The production of antimonial lead represents only a small portion of the total output of primary smelters. Their primary output is common lead, corroding lead, chemical lead, or acid lead.

233. Secondary smelters purchase some primary lead to make antimonial lead. This is done to bring down the antimonial content where it is too high. It is cheaper to add primary than it is to refine out the antimony.

234. Primary lead must be used by the Federated Metals Division of ASR in addition to secondary lead in order to bring semi-fabricated products and alloys up to specification.

235. Secondary lead is not used solely by the Federated Metals Division of ASR in the manufacture of semi-fabricated lead products and alloys because it would not be economical to subject the secondary lead to the refining cycle in order to remove impurities contained in the lead.

236. Antimonial lead presents the readiest market for secondary refiners and it is cheaper to leave in the antimony found in the materials (principally old battery plates) than it is to take it out and refine the lead to make corroding grade lead.

237. Many secondary smelters do not have the equipment to refine lead to corroding grade.

238. It is rarely feasible from an economic standpoint for a secondary smelter to refine lead to a corroding grade by removing the small percentages of silver and copper found in scrap materials. Thus instead of secondary soft lead going back into the battery industry, it is usually replaced by primary corroding lead and the secondary metal has to find another outlet.

239. Generally secondary soft lead is not suitable for rouse in batteries because of the minute percentages of silver and copper.

240. Antimonial lead is not suitable for many of the purposes for which corroding grade lead is suitable.

241. Antimonial lead is not suitable for the lead oxides of storage batteries and conversely corroding grade lead is not suitable for the grids in storage batteries.

242. In the storage-battery industry, the largest consumer of lead, there are some competitive products; but these have different electrical characteristics, and the raw materials for their manufacture are not available in adequate quantities to replace any sizable quantity of lead in battery usage.

243. Doe Run (corroding), St. Joe (chemical) and Herculaneum (common desilverized lead) are the three principal brands of lead produced by St. Joe.

244. St. Joe's production of corroding lead has been increasing in recent years and St. Joe's production of chemical lead has been decreasing.

245. Secondary smelters in the United States produce very little corroding grade lead.

246. Corroding grade lead sells at a premium of $2 a ton over the price of common lead.

247. The corroding grade lead premium of $2 a ton is not affected by secondary lead production.

248. The amount of the premium on corroding grade lead is determined by the producers of primary lead.

249. National Lead Co., the largest producer of secondary lead, with limited exceptions does not sell refined pig lead to the general public but uses the lead in the fabrication of lead products which it sells.

250. The Federated Metals Division of ASR, another of the largest producers of secondary lead, converts its secondary pig lead to various fabricated products which ASR sells to the trade.

251. Electric Storage Battery Co. has a secondary smelter which provides it with antimonial lead. Electric Storage Battery Co. uses the entire production of its secondary smelter in the production of its batteries.

252. Bunker Hill advises its customers that they will get a more uniform high purity of lead if they purchase primary lead in preference to secondary lead. Most of the larger and better customers are aware that if they buy primary lead they are assured of a more uniform high purity. This factor creates a trade preference for primary lead over secondary lead.

253. Bunker Hill does not sell any secondary lead to manufacturers of lead oxides for storage batteries.

254. Bunker Hill's secondary smelter at Seattle does not attempt to produce corroding grade lead as an item for sale.

255. Bunker Hill uses primary lead almost entirely for the manufacture of the lead oxides which it produces.

256. Some purchasers of lead specify primary corroding grade lead.

257. Some specifications for lead products used in connection with atomic energy units call for primary lead.

258. Primary lead is used exclusively in the manufacture of lead oxides for submarine batteries in order to prolong the life of the batteries and to avoid any danger of arsenic gas poisoning.

259. Only primary lead is used in the manufacture of oxides for batteries for the U. S. Coast Guard to insure the longevity of the battery.

260. Delco-Remy Division of General Motors Corporation specifies corroding grade lead when it purchases lead for the production of lead oxides for batteries.

261. Lead purchased by General Services Administration for stockpiling is primary lead.

262. Stockpiling of lead is done by purchases of lead from domestic miners.

263. Purchases of secondary lead for stockpiling would be outside the policy of the stockpiling program which is to aid domestic miners.

264. White lead must be made from corroding lead.

265. Pigment or paint people object to soft lead produced by secondary smelters because the silver content tends to discolor the whiteness required by their specifications.

266. Most and perhaps all manufacturers of white lead used for paint pigments will use only primary lead.

Discussion

■ In view of the detail of the findings of fact, which are substantially as submitted by the Government in its exhaustive presentation of the case, a brief comment will suffice. The fundamental issue, stripped of historical implications and a setting of intricate and important particulars, is the legality under the Sherman Act of an arrangement between the two largest miners of lead in the United States (each of whom is a substantial competitive factor in the business of smelting, refining and marketing of lead in the United States), whereby

one acts as the exclusive seller of a portion of the production of the other in a designated area of the country. The Government contends that the arrangement constitutes a combination to fix prices and to divide markets in violation of Section 1, and I agree.

Price fixing is denied by the defendants, who insist that their lead is sold at prices strictly responsive to supply and demand in the United States, including imports and lead from secondary sources, and to price changes on the London Metal Exchange (which closely reflects trading in the world market and world supply and demand, and which affects the flow of imported lead into the United States). But an analysis of the operation of the lead pricing system in the context of the arrangement between the defendants reveals a response that is far from unhindered. Lead is sold in the United States in two ways: at spot or flat prices, and on average price contracts. Spot price sales are reported by certain domestic producers to the Engineering & Mining Journal (E&MJ) which in turn publishes, weekly in New York, an average daily price of common lead delivered in New York and an average daily price of common lead delivered in St. Louis, based upon these reports, and weighted according to the prices at which lead has been sold by the reporting companies and the quantities sold at each price. The Engineering & Mining Journal also publishes weekly and monthly average prices for lead, which are arithmetical averages of the daily prices. The average price contracts are based upon these E&MJ weekly or monthly averages. Such sales, which constitute perhaps half of the sales of lead, do not enter into the lead price computation, narrowing the basis to spot sales. The basis for the price computation is further narrowed by the fact that only four domestic producers make reports to the Engineering & Mining Journal, and of these four, two are relatively small sellers, leaving the maximum influence to be exerted by the other two, American Smelting & Refining (ASR)

and St. Joe. Further, the reporting is done on the basis of prices at the two major markets, New York and St. Louis. ASR reports all of its domestic sales on the basis of the New York price, leaving to St. Joe, the principal seller of lead in the St. Louis area, in a peculiarly dominant reporting position there. St. Joe, moreover, controls the sale of Bunker Hill lead east of the 95th meridian and reports its own sales of lead as well as its sales of Bunker Hill lead. Bunker Hill does not report its own sales in the West. Thus, it is apparent that St. Joe's control over Bunker Hill sales in the East enhances St. Joe's influence on the E&MJ average prices. In addition, the reporting methods are such as to insure ASR and St. Joe maximum control of the E&MJ averages (see Findings 147–154).

It is true that ASR more frequently than any other seller has taken the lead in making changes in the price of lead, but St. Joe has been the leader in announcing price changes on an average of about once a year during the past twenty years. St. Joe announces the changes in the St. Louis price and fixes the amount of differential between the New York price and the St. Louis price. It is against St. Joe policy to cut the price of lead and St. Joe has never initated a decline in price. ASR sometimes changes its New York price downward as well as upward, whereas St. Joe never initiates a price decline in the St. Louis price prior to an ASR reduction in the New York price, and St. Joe has never declined to follow a price rise of ASR.

But regardless of the sequence of the initiation of price changes and of the speed of the conformation of the market to such changes, it is notable that the $2 a ton premium for corroding grade lead has been constant for years, despite the fluctuation in the price of common lead. The St. Joe-Bunker Hill relationship attacked in this case involves primarily corroding grade lead, produced and sold by both. The effect of this relationship has been to foster stabilization of the premium charged for this grade of lead.

Most of the primary lead sold in the United States is corroding grade lead and very little of this lead is produced by secondary producers. The additional purity in corroding grade lead as compared with other grades of lead including secondary soft lead enables manufacturers of corroding grade lead to charge a premium of $2 a ton over the common lead price. If all these grades of lead were interchangeable in use, obviously the premium for corroding grade could not prevail. The premium is not affected by secondary lead production, but is determined by the producers of primary lead. St. Joe's ores are low in silver content, while Bunker Hill's ores are high. St. Joe does not even have the facilities for treating ores of high silver content, and the cost to St. Joe of desilverizing Missouri ores to produce corroding grade lead is excessive in comparison with Bunker Hill's cost. The stability of the premium for corroding grade lead, received for St. Joe and Bunker Hill lead alike, is in eloquent contrast to a potential competitive threat to St. Joe's premium in the event of a termination of the contract between the defendants.

Of similar significance are the various differentials in the price of lead at various locations in the United States, as well as the delivered price system itself, whereby consumers receive no price advantage by reason of being located adjacent to a lead refinery. The various domestic price differentials are changed very infrequently compared with the frequency of changes in the basic price of common lead, nor do they accord with freight differentials from any shipping point. These differentials, like the corroding grade premium, cannot be attributed to the influence of the London Metal Exchange or the influence of secondary lead, nor to the wide and speedy dissemination of information on price changes. They must be attributed to ASR and St. Joe, whose influence is enhanced by its contractual arrangement with Bunker Hill.

The arrangements between the defendants further influence prices by a quantitative effect on production. Although the defendants argue that nothing prevents either Bunker Hill of St. Joe from producing as much lead as it wishes, nevertheless it is clear that the proportion clause in the agreement places a definite limit on the amount of lead which St. Joe is obligated to sell in the East for Bunker Hill, and Bunker Hill may not sell in the East. Moreover, in the event that St. Joe does not sell all of its own production and stocks lead, Bunker Hill will stock lead proportionately with St. Joe, thus reducing Bunker Hill's incentive to produce as much lead as possible. For St. Joe, as long as it continues as selling agent for Bunker Hill lead in the East, there is no incentive for it to expand its Herculaneum refinery to increase its own production. And when the market is weak, St. Joe has Bunker Hill lead to sell without producing as much of its own, thus resisting a lowering of market prices.

The defendants urge that neither the written agreement between them nor any other understanding prevents Bunker Hill from determining the price at which St. Joe sells Bunker Hill lead, or prevents St. Joe from determining the price at which it sells its own lead. The argument is incomprehensible except in a world of shadows. Bunker Hill has, in fact, never determined the price at which its corroding or common lead must be sold by St. Joe and the effect of the agreement is precisely to preclude such a determination. For it is inconceivable that St. Joe could sell its own and Bunker Hill's lead at different prices to the mutual benefit and satisfaction of both. St. Joe, as the seller qualified to gauge the eastern market, must determine price, and that price must hold for Bunker Hill as well as for itself. Whether a pricing decision by St. Joe is one to follow an ASR price move, to initiate a price advance, to fix the differential between the New York price and the St. Louis price, or to charge a specified premium for corroding lead over common lead, the decision is made by St. Joe for both its own lead and the lead which it sells for

Bunker Hill. No other procedure is imaginable. Indeed, it is unlikely in the extreme that Bunker Hill even dictates the prices of specification, caulking and antimonial lead sold for it by St. Joe in the East. In view of St. Joe's knowledge of the eastern market, such prices must certainly be determined with its collaboration, and the 1956 agreement provides for an elaborate exchange of information on market conditions, as well as production, sales and inventories.

■■ That the day to day fixing of prices is accomplished without the direct consultation and active participation of Bunker Hill is of no moment. "The fixing of prices by one member of a group pursuant to express delegation, acquiescence, or understanding is just as illegal as the fixing of prices by direct, joint action." United States v. Masonite Corp., 316 U.S. 265, 276, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461. Nor is there any concern in this case with the factors, upon which defendants have laid heavy stress, of the competition from other producers of primary lead, the competition from secondary lead and the competition from imported lead. For the inability of the defendants to control the market is irrelevant in a Section 1 conspiracy case. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, note 59 at page 225, 60 S.Ct. 811, at page 846, 84 L.Ed. 1129; United States v. McKesson & Robbins, Inc., 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209. The defendants have combined to fix prices on the common and corroding lead which is sold by St. Joe east of the 95th meridian, and the combination is illegal under Section 1 of the Sherman Act. United States v. Socony-Vacuum Oil Co., supra.

By the express terms of the current contract between the defendants, Bunker Hill may not sell any lead produced at its refinery at Kellogg, Idaho, east of the 95th meridian. St. Joe is designated as Bunker Hill's "agent" in the eastern territory, and the latter is entitled to have allocated to it a percentage of the former's sales according to an agreed formula, with additional provisions for the averaging of prices and freight. The defendants deny that such an agreement is in effect a division of markets. They contend that it is merely an agreement between principal and agent whereby the agent is utilized to accomplish the same result that the principal would accomplish for itself, but more efficiently, with the averaging clauses serving the purpose merely of a means of accounting to insure the principal of fair treatment on the destination of sales and prices received. The arrangement, it is insisted, is merely an exclusive sales agency for Bunker Hill lead in the East, leaving to Bunker Hill the sale of its own lead in the West, with nothing to prevent St. Joe from selling St. Joe lead in the West or East. And it is urged that the assignment of an exclusive territory to an agent is not a violation of the antitrust laws, absent monopoly. United States v. Bausch & Lomb Optical Co., D.C., 45 F. Supp. 387, 398–399, affirmed on this point by an equally divided Court 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, certiorari denied 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38.

It is true that the current contract between the defendants in terms only applies to the exclusive sale of Bunker Hill lead by St. Joe in the East, and to the sale of Bunker Hill lead by Bunker Hill in its reserved territory, but their agreements have in fact operated, and were intended to operate, to divide the United States lead market between the defendants on a territorial basis. St. Joe has sold its own lead west of the 95th meridian, but in insignificant quantities and not in competition with Bunker Hill. Most of the sales have consisted of chemical lead which Bunker Hill produces only for use in the fabrication of certain lead items. If St. Joe were to make substantial sales in the West in competition with Bunker Hill and in detraction of the latter's sales, Bunker Hill could declare a larger amount of its lead for sale by St.

Joe in the East. On the sale of Bunker Hill lead by Bunker Hill in the West, there has been close cooperation between the defendants. Bunker Hill's decision on the amount of lead it will reserve for sale in the West and the amount allocated for sale by St. Joe in the East has not always represented an independent business judgment by Bunker Hill, but has been the product of discussions with St. Joe. The 1956 agreement, as indicated, provides for an elaborate exchange of information relating to the market conditions of the products covered, with special emphasis on apparent changes and trends that might affect their planning, and relating to production, sales and inventories. St. Joe has exerted influence on Bunker Hill's sales in the West, both as to terms of sale and quantity. Bunker Hill has been advised what prices to charge in the West to customers who also bought from St. Joe in the East, and in times of short supply Bunker Hill has restricted its sales of lead in the West in order to have more lead for shipment to St. Joe's customers in the East.

One of the major reasons advanced to explain St. Joe's concentration on the eastern market almost to the exclusion of the western market is the economics involved in western freight rates. But it appears that the freight rate from the Bunker Hill smelter and refinery at Kellogg, Idaho, to many cities east of the 95th meridian where Bunker Hill lead is sold by St. Joe, is higher than the freight rate from St. Joe's Herculaneum, Missouri, smelter and refinery to San Francisco, Los Angeles, and Seattle. There are points west of the 95th meridian to which the carload lot freight rate for pig lead from Kellogg is higher than it is from Kellogg to some points east of the 95th meridian. And the freight rate from Herculaneum to many cities west of the 95th meridian is lower than the freight rate from Kellogg to these cities. Indeed, it has always been more advantageous for St. Joe to sell Bunker Hill lead on the east coast than to sell St. Joe lead, because the freight cost is only $9 a

ton more from Kellogg to New York than from Kellogg to St. Louis or Chicago, while the freight rate from Herculaneum to New York is $15.68. The possibility of St. Joe taking the more favorable midwestern freight areas for its own lead is undoubtedly the major reason for the averaging of freight provisions in the agreements since 1951. It is at least highly probable that in the absence of an agreement between the defendants, Bunker Hill would endeavor to sell the majority of its lead in the midwestern area, leading to a competition with St. Joe presently nonexistent. Since the latter part of 1957 St. Joe has been unable to sell the quantities of Bunker Hill lead that Bunker Hill wants sold east of the 95th meridian, nor has St. Joe been able to sell its own total production. Accordingly, Bunker Hill is presently stocking lead in excess of its normal inventory. If the territorial restrictions of the current contract were eliminated, Bunker Hill might very well be able to reduce its surplus of lead stock. The purpose of the proportion clause is to limit the amount of Bunker Hill lead to be sold in the East to that amount which St. Joe can sell without depressing the lead price.

It is, therefore, impossible to find as a fact, as sought by the defendants, that St. Joe has sold as much Bunker Hill lead as, in all probability, Bunker Hill would have sold for itself in the East, and to the same destinations and with the same net return. Consequently, omitting from consideration the effect of the agreement upon competition between St. Joe and Bunker Hill west of the 95th meridian, it is clear that by express agreement there is no competition east of that line, where approximately 80 per cent of the consumption of lead in the United States occurs. Bunker Hill refrains from selling in that area in favor of an allocation of an agreed share of St. Joe's total sales, under the formula. Whether the defendants have agreed upon a territorial division between themselves of the entire United States lead market, with neither competing in the other's territory, or

whether they have merely directed their restraints toward that part of the market east of the 95th meridian, the arrangement is unlawful under the doctrine of United States v. Addyston Pipe & Steel Co., 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, precluding a division between competitors of the territory in which they would otherwise compete.

■ The ultimate, and obvious, question asked by the court during the course of the trial has not been satisfactorily answered by the defendants. What is the advantage of this arrangement to St. Joe in a weak market, as currently prevails? For Bunker Hill the answer, applied to any kind of a market, is hardly mysterious. It gets a share of the eastern market without the necessity of competing with St. Joe and without the risk to prices that such competition would entail. The price averaging provision assures Bunker Hill that in the event of price fluctuations it will receive equal treatment with St. Joe and the freight averaging provision assures equal treatment on destinations. The availability of St. Joe's experience and expert sales organization in the East, eliminating for Bunker Hill the trouble and expense of having one of its own, can only be regarded as incidental (nor would such an economic consideration be relevant to the issue of whether there has been an antitrust violation, see United States v. Richfield Oil Corporation, D.C., 99 F.Supp. 280, at pages 286–287, affirmed 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334. For St. Joe, when there is no difficulty in selling its entire production at a favorable price, it derives the benefit of commissions on additional sales. But in today's market, St. Joe does not sell its entire production, while nevertheless making substantial sales on behalf of Bunker Hill. For every ton of Bunker Hill lead sold by St. Joe, a ton of St. Joe lead is displaced. No contention is made that it is more profitable for St. Joe to sell as an agent than as a producer. By the same token it is no answer to say that St. Joe's purpose is to obtain additional income at

little added expense and to have available for its customers grades of lead that it does not itself make. The untenable agency contention is thus simply reinforced by a point based on a tiny percentage of sales and which is in any event invalid. It appears that those other grades of lead could readily be made by St. Joe. But more significantly, the fact that St. Joe can obtain those grades from Bunker Hill without having to produce them itself, when it is a potential competitor, helps to establish the unreasonableness of the agreement. The Sherman Act proscribes restraints of potential competition as well as restraints of actual competition. United States v. United Shoe Machinery Co., 247 U.S. 32, 53, 38 S.Ct. 473, 62 L.Ed. 968; United States v. General Dyestuff Corporation, D.C., 57 F.Supp. 642, 648. Moreover, St. Joe has not in any event been overanxious to sell the grades of lead it does not produce. Its policy of not competing with its customers has precluded it from selling as much as it might.

The answer to the question posed is anything but elusive. St. Joe's primary purpose is to gain for itself the control and supervision of the sale and allocation of Bunker Hill lead in the East, with the consequent effect on prices reported in the Engineering & Mining Journal. The proportion provision in the agreement affords St. Joe some protection against being forced to sell Bunker Hill lead in a weak market, but Bunker Hill lead obviously displaces a very considerable tonnage of St. Joe lead nevertheless. The intention and effect of St. Joe's participation in the arrangement with Bunker Hill is to minimize the effect of competition on the price of lead. Unquestionably the arrangement has affected the price of lead. To say that "lead is lead", a standardized commodity with a strong tendency to uniformity of price; that Bunker Hill has never been a price leader; that it wants to sell its lead at the best price obtainable; and that as a result if it were to sell its own lead in the East it would not deviate from its pres-

ent price policies, is not only to indulge in speculation bordering on fantasy, but it is to accept the results of almost four decades of conditioning under the accused arrangement. A decree of this court prohibiting Bunker Hill from selling through a competitor may indeed not have the effect of enforcing competition, but it can eliminate a combination which renders competition impracticable, United States v. Union Pacific R. Co., 226 U.S. 61, 85, 33 S.Ct. 53, 57 L.Ed. 124, a result the more important because of the standardized commodity involved, Sugar Institute, Inc. v. United States, 297 U.S. 553, 600, 56 S.Ct. 629, 80 L.Ed. 859.

To the extent that "ancient history" is involved in the evidence, there is some reluctance by the court. Nevertheless, a consideration of the record as a whole demonstrates forcefully that the relationship between the defendants was conceived in the desire to eliminate competition between them, and that without interruption since 1922 this purpose has been intensively and successfully nurtured. The fundamental arrangements have not been altered and the continuing relationship is as close as it has ever been, and with the same significance. I can conceive of no alteration in the terms of the contract which would alter this relationship effectively toward a change of purpose. I agree that the defendants have become so close through the years that they could operate indefinitely under any changes in their contract without in fact changing their non-competitive positions in the least. Accordingly, the plaintiff is entitled to an order prohibiting Bunker Hill from marketing its lead through St. Joe or any other competitor.

## Conclusions of Law

Since 1922 and continuing to date the defendants St. Joe and Bunker Hill have been parties to a combination and conspiracy and a succession of contracts in unreasonable restraint of interstate and foreign commerce in primary lead, in violation of Section 1 of the Sherman Act (26 Stat. 209; 50 Stat. 693; 15 U.S.C.A. § 1).