**PLYMOUTH DEALERS' ASSOCIATION OF NORTHERN CALIFORNIA,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 16800.

United States Court of Appeals
Ninth Circuit.

May 26, 1960.

Rehearing Denied Aug. 1, 1960.

**129**

Harold C. Faulkner, Melvin, Faulkner, Sheehan & Wiseman, San Francisco, Cal., for appellant.

Robert A. Bicks, Acting Asst. Atty. Gen., Lyle L. Jones, Don H. Banks, Gilbert Pavlovsky, Luzerne E. Hufford, Jr., Attys., Dept. of Justice, San Francisco, Cal., for appellee.

Before POPE, BARNES and MERRILL, Circuit Judges.

BARNES, Circuit Judge.

Appellant Plymouth Dealers' Association of Northern California was charged in a one count indictment with violation of Title 15 U.S.C.A. § 1, a part of the Sherman Act.[1] Appellant was convicted by a jury, fined $5,000, and files a timely appeal. The court below had jurisdiction under Title 18 U.S.C. § 3231. This Court has jurisdiction of the appeal. Title 28 U.S.C. §§ 1291, 1294.

The indictment charged that the appellant and certain co-conspirators engaged in "a combination and conspiracy to stabilize the retail prices of Plymouth motor cars and accessories in the San Francisco Bay Area, in unreasonable restraint" of interstate commerce.

As described by appellant, "the paramount question before the Court is whether the charge above alleged in detail is sustained by the evidence in this case." Thus the first specification of error is insufficiency of the evidence as a matter of law to support the verdict.

There are two additional specifications of error. One alleged error is in instructing the jury,[2] and the other is the insufficiency of the evidence to establish interstate commerce. Appellant considers specifications of error one and two as one matter, as will we.

The first alleged error has been sharply defined by appellant's oral argument and brief. Appellant was charged with engaging in "a combination and conspiracy to stabilize prices." It is un-

[1]. 26 Stat. 209 (1890), as amended 15 U.S. C.A. § 1. The applicable portion of the statute reads as follows:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

[2]. "that an agreement or a common understanding to stabilize retail prices or to fix uniform retail list prices for articles in interstate commerce is illegal and forbidden by Sec. 1 of the Sherman Act."

**130**

disputed that appellant printed and published a price list and circulated it to its members. If such acts are sufficient to violate the law, says appellant, then this appeal has no merit. But, he argues, if this be insufficient, and if the trier of fact is to determine whether the conduct of appellant *under all the circumstances existing in the case,* constitutes a violation of the Sherman Act, then the jury was improperly instructed,[3] and the judgment of conviction should be reversed.

Appellant urges that agreeing on a fixed uniform list price, and sending it

out to a dealers' association's members cannot violate Section 1 of the Sherman Act, unless there is proof of something more—that it was adhered to; that it was utilized to fix prices; or that it did actually fix prices.

Inasmuch as automobiles are sold at their cost plus a retained gross profit, and the manufacturer's cost does not vary in the restricted market area involved, the gross profit is the only variable. If sold at the factory's suggested retail price, a 24% gross profit would result; if sold at the association's suggested retail price, a 33⅓% gross profit

3. Four instructions (A, B, C and D) are attacked by appellant. These were as follows:

"A. It is not necessary, ladies and gentlemen of the jury, in this type of case, for the Government to prove that the conspiracy actually was a burden on commerce, and it is not necessary for the Government to prove that competition actually was suppressed. The gist of the charge in a case of this kind is simply whether or not the parties knowingly agreed or entered into an understanding between themselves to do the things prohibited by the statute.

\* \* \* \*

*The Court charges you that an agreement or a common understanding to stabilize retail prices or to fix uniform retail list prices, for articles in interstate commerce, is illegal and forbidden by Section 1 of the Sherman Act.*

"B. An example of what I mean is to be found in the use of a price schedule or a price list of any kind. It is not unlawful for a person to use a price schedule or a price book in the regular course of his business, so long as the list is not used in fixing prices in restriction of competition. *However, when two or more business men agree upon the prices contained in a given price schedule to fix prices,* by the mere fact of so agreeing, they have abandoned their status as independent competitors and have become engaged in an unlawful conspiracy or combination in violation of Section 1 of the Sherman Act.

"C. You are instructed, ladies and gentlemen of the jury, that if from the evidence you find beyond a reasonable doubt that the directors and officers of the defendant corporation did meet from time to time *and did agree during the period of time alleged in the indictment, that the defendant should formulate retail*

*list prices for Plymouth motor cars and accessories, and that such prices as formulated should be printed and distributed to coconspirator Plymouth dealer members of the defendant Association in the form of price schedules, and you further find that the price schedules so agreed upon were a substantial part of the price structure used in the sale of Plymouth motor cars in interstate commerce, then you should find the defendant guilty of violating the Sherman Act as charged in the indictment.*

"D. You are instructed that if from all the evidence you find that the directors and officers of the defendant did meet from time to time and did agree during the period of time alleged in the indictment, that defendant should *formulate* retail list prices for Plymouth motor cars and accessories, and that such prices as formulated should be printed and distributed to coconspirator Plymouth dealer members of the defendant Association in the form of price schedules, and if you further find that this action of defendant and its coconspirators was done with the expectation or intent of *establishing* uniform retail *list prices* to be quoted by coconspirator dealers for Plymouth motor cars and accessories *establishing* retail quoted list prices for Plymouths at levels above those suggested by Plymouth Division, diminishing the bargaining pressure from purchasers by enabling said dealers to offer fictitiously large discounts and fictitiously high trade-in allowances, and for the purpose of maintaining or increasing the selling prices of Plymouth motor cars and accessories sold in interstate commerce, then you should find the defendant guilty of violating the Sherman Antitrust Act. \* \* \* "

would result. Thus the list price, argues appellant, was merely a device to permit the giving of larger allowances on trade-ins, a "packing" that did not affect the price, and hence was no restraint of trade.

The difficulty with appellant's position is that the Supreme Court has ruled that certain acts constitute *per se* violation of the antitrust laws, and no explanation of why the act was done, nor what its effect might be in a particular case, is of any consequence or materiality.

This Court has reason to keep this rule of law in mind. Klor's Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. There the Court said:

"In the landmark case of Standard Oil Co. [of New Jersey] v. United States, 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619], this court read § 1 to prohibit those classes of contracts or acts which the common law deemed to be undue restraints of trade and those which new times and economic conditions would make unreasonable. Id. [221 U.S. at pages] 59–60 [31 S.Ct. at pages 515–516]. * * * The court recognized that there were some agreements whose validity depended on the surrounding circumstances. It emphasized, however, that there were classes of restraints which from their 'nature or character' were unduly restrictive, and hence forbidden by both common law and the statute. 221 U.S. at [pages] 58, 65 [31 S.Ct. at page 515]. As to these classes of restraints, the court noted, Congress had determined its own criteria of public harm and it was not for the courts to decide whether in an individual case injury had actually occurred. Id. [221 U.S.] at [pages] 63–68 [31 S. Ct. at pages 517–518–519]."

359 U.S. at page 211, 79 S.Ct. at pages 708–709 (Footnotes omitted.)

While there may be some question as to whether certain acts do or do not constitute *per se* violations, there can be no question but that fixing prices is one of the three [4] most readily recognized and generally acknowledged *per se* violations of Section 1 of the Sherman Act.

The basis for the conclusive presumption rationale of the Standard Oil Co. case is clearly stated in United States v. Trenton Potteries, 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700.[5] In a passage described as "often quoted" the Court said:

"[I]t does not follow that agreements to fix or maintain prices are reasonable restraints and therefore permitted by the statute, merely because the prices themselves are reasonable. Reasonableness is not a concept of definite and unchanging content. Its meaning necessarily varies in the different fields of the law, because it is used as a convenient summary of the dominant considerations which control in the application of legal doctrines. Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least in the light of its effect on competition, for, whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it are based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition. * * *

4. The others: limiting production and division of markets by agreement among competitors. Report of the Attorney General's National Committee to Study the Antitrust Laws, pp. 12, 26 (1955).

5. We note that in Trenton Potteries, a trade association was involved. We also note that it was a combination to fix a market price, not a list price. We shall consider that point later.

"The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of to-morrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions. Moreover, in the absence of express legislation requiring it, we should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies."

273 U.S. at pages 396–398, 47 S.Ct. at page 379.

■ Further, once the agreement to fix a price is made, it is conclusively presumed that a conspiracy to restrain trade exists, and it is "immaterial whether the agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made to carry the object of the conspiracy into effect." United States v. Trenton Potteries, supra, 273 U.S. at page 402, 47 S.Ct. at page 381.

■ When the term "fix prices" is used, that term is used in its larger sense. A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable *per se* under the Sherman Act. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129. The test is not what the actual effect is on prices, but whether such agreements interfere with "the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, supra, 340 U.S. at page 213, 71 S.Ct. at page 260. The competition between the Plymouth dealers and the fact that the dealers used the fixed uniform list price in most instances only as a starting point, is of no consequence. It *was* an agreed starting point; it had been agreed upon between competitors; it was in some instances in the record respected and followed;[6] it had to do with, and had its effect upon, price.

The fact that there existed competition of other kinds between the various Plymouth dealers, or that they cut prices in bidding against each other, is irrelevant. This point is touched upon in the recent case of United States v. American Smelting and Refining Company, D.C.S.D.N.Y. 1960, 182 F.Supp. 834. CCH Trade Reg. Rep. ¶69,675.[7]

6. Contrary to the statement in Appellant's Brief, p. 37.

7. In holding existence of competition is not a factor, Judge Edelstein said: "For the inability of the defendant to control the market is irrelevant in a Section 1 Conspiracy case." Id., at p. 76,679, citing United States v. Socony-Vacuum Oil Co., supra, note 59 at page 225 of 310 U.S., at page 846 of 60 S.Ct.; and United States

Nor does the fact that a plan entered into by competitors to control prices, and having an effect thereon, did not ultimately succeed in accomplishing what the parties anticipated, absolve them from their violation of the law.

In a deteriorating market (at least with respect to automobile dealers, as was the case in the market defined as "Plymouth cars sold in the San Francisco Bay Area in 1955–56–57 and –58"), no matter what steps are taken to influence prices, sometimes the power of larger economic factors prevail, and the average retained gross profit of the dealer goes down. The question is not what the profit was, but how it got where it was, and what it would have been had there been no agreement to influence or stabilize prices. The very fact that this is extremely difficult of proof is probably one of the reasons why, in its wisdom, the Congress has seen fit to establish the law, and the Supreme Court to establish certain *per se* consequences of the proscribed action.

Appellant relies largely upon Board of Trade of City of Chicago v. United States, 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, which holds that price fixing may not necessarily be an illegal restraint of trade, that "the true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." 246 U.S. at page 238, 38 S.Ct. at page 244.

The Attorney General's Committee to Study the Antitrust Laws points out that in the Board of Trade of City of Chicago case the Supreme Court concluded the rule had no effect on general market prices, nor on the volume of grain coming to Chicago. On the contrary, the Court found that the rule served legitimate regulatory purposes of the exchange, rather than price fixing objectives.

"The Court treated the rule therefor, not as a species of price fixing, but as a regulation of the hours of trading, whose effect would be to bring more of the class of transactions affected into the regular and fully competitive sessions of the Exchange." [8]

Likewise, appellant relies on Sugar Institute v. United States, 1936, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 holding that the illegality lay in efforts to promote adherence to the announced prices and terms, not the price list itself. Repeatedly the appellant refers in this case to the lack of adherence to the price list; the failure of the Association to take steps to enforce, the lack of any agreement to adhere to it. But there is testimony by members of the Association from which it can be inferred that some sales actually were made at the list price.

Further, common sense tells us that there is no need for competitiors to meet, agree upon content, print and circularize "list prices" that are never to be looked at. There was testimony the fixed list price was created and intended to be used to eliminate public distrust, occasioned by the previous wide variance in quoted retail prices which were determined as a matter of individual dealer judgment, varying to meet competitor's prices.

The "fixed, uniform list price" was not precisely followed in many, in fact in most, instances. It was not intended to be so used. It was fixed "high" so a greater trade-in could be allowed; so that the ultimate percentage of gross profit over the factory price could be higher. It was used by some dealers in seventy-five per cent of their deals. This list price was shown to customers, at times, as "the regular price" of the automobile. By the agreed uniform list price, Plymouth list price became $2,340 in San Francisco, rather than $2,130. We cannot agree that such an agreement would necessarily fall into the classification of having a "regulatory purpose," (as in the Board of Trade of City of

v. McKesson & Robbins, Inc., 1956, 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209.

8. Report of the Attorney General's National Committee to Study the Antitrust Laws, at p. 23 (1955).

Chicago case) but rather is of a class having a definite effect on prices.

Here the Association members all had to pay the factory price for their Plymouths. To agree to put the starting price for their bargaining at $2,340 instead of $2,130 (the manufacturer's suggested retail price), they were following a minimum price, not within their control, as modified by a hypothetical gross price, controlled by the dealers. This established as a matter of actual practice one boundary of "the range within which * * * sales would be made." Socony-Vacuum Oil Co., supra, 310 U.S. at page 222, 60 S.Ct. at page 844. This was "a factor which prevents the determination of [market] prices by free competition alone." Id., 310 U.S. at page 223, 60 S.Ct. at page 844. Compare also the rationale of the Kiefer-Stewart opinion in the Circuit Court (Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 7 Cir., 1950, 182 F.2d 228), and in the Supreme Court (Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219) where it was reversed.

Thus far we have not touched upon two specific examples of agreements fixing prices. In 1958 appellant and coconspirator dealers agreed upon the selling price at which the "Silver Special" was to be offered, $1,972. In 1955 appellant had a "jalopy program," in which it and the coconspirator dealers agreed upon a uniform $500 trade-in on any car, irrespective of condition, on monthly payments, cash down payment figures to be carried in advertisements, and circulated suggested retail prices. These were *per se* violations of the law.[9] But, of course, they do not cure the instructions here complained of, if error occurred therein. We turn to the instructions.

■ Instruction A (supra, note 3) referred to an agreement or understanding that would *stabilize* retail *prices*, or *fix* uniform retail list *prices* for articles in

interstate commerce, as illegal. Instruction B referred to an agreement (upon the prices contained in a given price schedule) *to fix prices*. Instruction C referred to the *formulation* of retail list *prices*, printed and distributed in the form of price schedules, and required the jury, before convicting, to find a further essential: that such price schedules were a *substantial part of the price structure used in the sale of the automobiles*. Instruction D dealt with the formulation and distribution of a schedule of prices with the *intent* of establishing list *prices* at higher levels than Plymouth factory suggested prices. (Italics and parenthesis ours.) While perhaps the language used was not as artful as might be wished, we cannot read them to have required the jury to convict on the printing of a price list alone, as appellant urges.

The trial court submitted to the jury whether "the price schedules so agreed upon were a substantial part of the price structure used in the sale of Plymouth motor cars by appellant." The jury's holding against appellant is supported by the evidence.

■ We have not commented upon the Disclosure of Automobile Information Act,[10] also known as the Monroney Bill, cited to us by appellant. It became effective October 1, 1958, and affects nothing herein. Suffice it to say that it is one thing for Congress to say each manufacturer must, acting alone, set a suggested retail list price for his product, and another thing to say that competing dealers may so agree. Many unilateral acts are completely lawful but become violative of antitrust law when performed pursuant to an agreement between competitors. Further, the purpose of the Monroney Bill was to prevent misbranding, abuse of caravan car prices and the "packing" which were appellant's primary objectives here.

We find no error in the law adopted by the trial court, and the instructions based thereon, given to the jury.

---

9. Or, as the trial court stated: "The Silver Special is a plain out-right, clear, violation of the Sherman Act."

10. 72 Stat. 325-326, 15 U.S.C.A. §§ 1231-1233.

We next come to the question as to whether there was interstate commerce. We are satisfied there was. We adopt appellee's argument on this phase of the case. It is supported by the record.

"86% of the parts and equipment which go into Plymouths assembled at the Los Angeles plant (including such items as the frames, engines, doors, axles, transmissions, and body stampings) are manufactured outside of California and then shipped in interstate commerce to the Los Angeles assembly plant. We think it clear that in the circumstances, the interstate movement of these parts ' * * * was merely halted as a convenient step [i. e., assembly] in the process of getting [these cars] to [the dealers and through them to the consumer].' Binderup v. Pathe Exchange, Inc., 263 U.S. 291 [44 S. Ct. 96, 68 L.Ed. 308] (1923). Appellant's attempt to isolate the Los Angeles plant from Chrysler's integrated interstate operations is a 'technical legal conception' of 'commerce among the States,' not the 'practical one, drawn from the course of business,' which the Supreme Court has stressed as controlling. Swift & Co. v. United States, 196 U.S. 375, 398 [25 S.Ct. 276, 49 L.Ed. 518] (1905); see also Stafford v. Wallace, 258 U.S. 495, 518–519 [42 S. Ct. 397, 66 L.Ed. 735] (1922). Las Vegas Merchant Plumbers Ass'n v. United States, supra [210 F.2d] at p[age] 740; Pevely Dairy Co. v. United States, 178 F.2d 363 (C.A.8, 1949); Marks Food Corp. v. Barbara Ann Baking Co. [9 Cir., 1960, 274 F.2d 934].

"In any event, this question of whether there was a flow of goods from out-of-state which remained in commerce through the conduit of the Los Angeles plant was properly left to the jury. Las Vegas Merchant Plumbers Ass'n v. United States, supra [210 F.2d] at p[age] 745. * * * [T]here is ample evidence to support the jury's verdict. It follows that every car the co-conspirator dealers received, whether from out-of-state or from the Los Angeles plant, was in the flow of interstate commerce; and that approximately 35% of such commerce (and certainly a significant amount) was pursuant to specific customer orders and therefore remained in interstate commerce until delivery to the customer."

Finding no error, the judgment of conviction is affirmed.