Richard KLINE et al.,
Plaintiffs-Appellees,

v.

COLDWELL, BANKER & CO., Realtors, et al., Defendants-Appellants.

No. 73–2169.

United States Court of Appeals,
Ninth Circuit.

Dec. 20, 1974.

Carl Schuck (argued), Overton, Lyman & Prince, Los Angeles, Cal., for petitioners L. A. Realty Board and others.

Bridges & Bridges, Los Angeles, for petitioner Lindgren.

Seth M. Hufstedler, Beardsley, Hufstedler & Kemble, Los Angeles, Cal. (argued), for petitioners Coldwell, Banker & Co.

Daniel Fogel, Bodle, Fogel, Julber & Reinhardt, Los Angeles, Cal. (argued), for respondents-appellees.

Before DUNIWAY and TRASK, Circuit Judges, and POWELL,* District Judge.

* Honorable Charles L. Powell, Senior United States District Judge for the Eastern District of Washington, sitting by designation.

## OPINION

TRASK, Circuit Judge:

In this proceeding under the Interlocutory Appeals Act of 1958, 28 U.S.C. § 1292(b), we are called upon to decide by means of an interlocutory appeal whether this suit may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure. The action was brought by plaintiffs Richard and Margo Kline, husband and wife, on behalf of themselves and all sellers of residential real estate in Los Angeles County against the Los Angeles Realty Board and its several divisions and 32 named real estate brokers representing a class consisting of all real estate brokers who were members of the Board during the 4-year period prior to the filing of the action.

Plaintiffs allege that the Board and its members conspired in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, to fix brokerage commissions through distribution of a recommended fee schedule to its members. Plaintiffs claim that the fee schedule fixed commissions at a higher rate than it would have been absent the schedule, causing damage to plaintiffs which they are entitled to have trebled under section 4 of the Clayton Act, 15 U.S.C. § 15. During the 4-year period involved, approximately 800,000 deeds were recorded in Los Angeles County. Based upon this fact defendants estimated that upwards of 400,000 sales with approximately that number of plaintiffs could well be involved in this class suit.[1] By virtue of the alleged conspiracy and the damages sustained the plaintiffs prayed for a judgment against the defendants as a class and each of them individually totaling $250 million actual damages trebled to $750 million or according to the proof adduced at trial, together with a reasonable attorney's fee and costs of suit.

More than 2,000 brokers who were members of the Los Angeles Realty Board and its divisions performed services during the 4-year period in the sale of residential property, which is defined as any lot or parcel of real property improved with from 1 to 12 dwelling units. Defendants denied participating in any conspiracy. The defendant Board admitted publishing and distributing a commission schedule but denied that any member was required to follow it. The fee schedule suggested a commission of six percent of the total purchase price. The foreward of the schedule states in part:

"It should be understood that no member of the Los Angeles Realty Board, or any other Realtor is in any way bound by this Schedule. The amount of the commission on any real estate transaction is a matter for the parties to that transaction and is in no way subject to the control of the Los Angeles Realty Board."

The trial court received a motion for certification of the action as proper under Rule 23. After having considered the motion, the opposition, voluminous supporting documents and filings and after having heard extensive argument, the district court granted the motion in part and denied it in part to the following effect:

(1) The named plaintiffs Richard and Margo Kline, husband and wife, were found to be representative of a class of all persons who sold residential property within Los Angeles County, California, during the period September 24, 1966, to September 23, 1970, and used the services of one or more of the named defendant real estate brokers or brokerage firms or any member of the Los Angeles Realty Board (including its divisions) and compensated said brokers or firms for their services.

(2) The 32 named defendant real estate brokers and brokerage firms together with the Los Angeles Realty Board and its branches were determined to be representative of a defendants' class of all real estate brokers who during the

---

1. The plaintiffs did not disagree but suggested at oral argument as a word of caution that there might be more.

same period were members of the Los Angeles Realty Board including its branches and who acted in that capacity in connection with the sale of residential real property.

(3) The district court denied Martin Simon status as a representative of a class of "unsuccessful sellers of real property," because it would have been inappropriate under Rule 23.

(4) The court also denied representative status to sellers of commercial and industrial property.

The court's two findings of representative status were based in part on its determination that the central issue concerned whether there was a conspiracy entered into by the defendants to fix prices for commissions in sales of residential real property in Los Angeles County. This issue, the court found, presented common questions of law and fact which predominated over any questions of law and fact affecting only individual members of the classes. A subissue, ruled the court, was whether there was a schedule of commissions prepared, published and distributed by the defendants and whether said schedule was substantially adhered to by the broker defendants. This central and subissue should not have to be tried on more than one occasion, said the court, and although individual issues did exist such as whether the individual brokers knew of the schedule and whether they conformed to it, these individual issues did not predominate over the common issues of law and fact. The court having concluded that its order involved a controlling question of law as to which there was a substantial ground for difference of opinion, certified it for immediate appeal under 28 U.S.C. § 1292(b). This court has entered its order permitting the appeal.[2] Defendants appeal the district court's order finding the case to be proper class action.

Without expressly so stating, the parties appear in agreement that whether this is a proper class action is to be determined under Rule 23(b)(3). We are in accord.[3] Rule 23(b) first requires that

---

**2.** Although questions were raised as to the application of the Interlocutory Appeals Act to the order of the trial court certifying the appeal as an interlocutory one, those questions were briefed by counsel on both sides and the order granting permission to submit an interlocutory appeal was granted by another panel of this court. We do not further examine that question.

**3.** Rule 23(b) states in pertinent part:

"(b) . . . An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesir-

ability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

As originally enacted, Rule 23 would not have accommodated a suit like that filed here. It provided only for a "true class suit" in which, but for the rule, the joinder of all interested persons would have been essential, 3B J. Moore, Federal Practice ¶ 23.08 (1974); the "hybrid" class suit where the interests of the parties were several but concerned a specific property, *id.* ¶ 23.09; and the "spurious" class suit where there was no jural relationship between the parties but a common question of law or fact existed. Such an action was an invitation to those having such an interest to join but not a requirement that they accept. *Id.* ¶ 23.10. The importance of Rule 23 at this time was not outstanding. In 1966 the rule was amended to provide a more flexible remedy. Recoveries would be available for or on behalf of all members of the class and the judgments binding upon all provided the requirements of the rule were met. The popularity of class actions increased fourfold within a period of 4 years and developed a host of champions and critics. Compare Blecher, Is the Class Action Rule Doing the Job? (Plaintiff's viewpoint), with Simon, Class Actions—Useful Tool or Engine of Destruc-

the prerequisites of Rule 23(a) must be satisfied. They are (1) that the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. The propriety of the certification of both plaintiff and defendant classes and of the class action in general must be measured against these requirements.

■ It appears clear that prerequisites (1) and (2) are satisfied by both classes, and no question has been raised as to the adequacy of representation under (4). Although Mr. and Mrs. Kline represent some 400,000 sellers, they are sellers who have employed one of the defendant class members; there are 32 named brokers and brokerage corporations as well as the Los Angeles Realty Board and its branches as defendants, and it can well be assumed that the other 2,000 defendants are adequately represented by them. Whether the claims or defenses of the representatives of the named parties are typical of all the claims and defenses of the absent members of the two classes will be considered under subsection 23(b)(3), since to a considerable extent the criteria are similar. We consider, then, the additional requirements of Rule 23(b)(3): (1) whether common questions

predominate over individual ones; and, (2) whether the action is "manageable."

I. *Whether the Questions of Law or Fact Common to the Members of the Class Predominate Over Any Questions Affecting Only Individual Members.*

The crux of defendants' argument is that individual questions concerning the liability of each individual broker defendant and the injury of each individual plaintiff predominate over any common questions of a conspiracy. The plaintiffs adversely contend that they can prevail on a legal theory which avoids individualized issues of defendant liability, which establishes plaintiff injury in general, and which leaves the determination of the *quantum* of individual recovery to a mechanical process or to separate adjudication. In short, appellees argue that they can prevail on a *generalized* antitrust theory (utilizing "per se" rules) while the appellants deny this and argue that individual issues must be litigated. Resolution of this controversy requires an examination of substantive antitrust law.

■ In order to prevail under section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, the plaintiffs must prove both that the defendants' conduct contravened section 1

---

tion, 55 F.R.D. 365, 375 (1973). The courts have had their own difficulties in solving the problems generated by the rule. Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) (Eisen I); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968) (Eisen II); and Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973), vacated, 416 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (Eisen III).

The Supreme Court at the last term, October 1973, passed upon two cases involving the scope of class actions. Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), held that a diversity action seeking damages could not be maintained on behalf of unnamed plaintiffs whose claims did not meet the jurisdictional amount requirements. Eisen v. Carlisle & Jacquelin, 416 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), upheld the decision of the Court of Appeals in Eisen III, *supra*, that individual notice must be given to all identifiable members of the class at the plaintiff's expense and that a preliminary or "mini-hearing" on the merits to determine whether it might be maintained as a class action was improper.

Our own court has had more than one occasion to consider the problems of Rule 23 as amended. Most recently we have had before us La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973), and In Re Hotel Telephone Charges, 500 F.2d 86 (9th Cir. 1974).

*and* that the plaintiffs suffered injury as a direct result of this illegal conduct.[4] Each of these two facets will be separately considered.

### A. Establishing illegal defendant conduct.

■ The appellees advance two theories under which they contend that they can establish illegal conduct without individualized proofs. Both theories are based upon trade association practices and can be called the "Membership-Ratification" theory and the "Adherence" theory. The former relies heavily upon Phelps Dodge Refining Corp. v. FTC, 139 F.2d 393, 396–397 (2d Cir. 1943), which stated:

> ". . . [T]he issue is reduced to whether a member who knows or should know that his association is engaged in an unlawful enterprise and continues his membership without protest may be charged with complicity as a confederate. We believe he may. Granted that his mere membership does not authorize unlawful conduct by the association, once he is chargeable with knowledge that his fellows are acting unlawfully his failure to disassociate himself from them is a ratification of what they are doing. He becomes one of the principals in the enterprise and cannot disclaim joint responsibility for the illegal uses to which the association is put."

Since *Phelps Dodge* the "Membership-Ratification" theory has been reformulated by numerous courts including this circuit. In each of these reformulations much of the stress falls upon the knowledge component. In Riss & Co. v. Association of American Railroads, 187 F.Supp. 306, 312–313 (D.D.C.1960), the court said:

> "The individual . . . members of the associations can be held responsible for the unlawful conspiratorial acts or declarations of the associations only if they are shown *to have known and approved of such activities and of their unlawful objectives.*" (Emphasis added.)

In Vandervelde v. Put & Call Brokers & Dealers Association, Inc., 344 F.Supp.

---

4.  15 U.S.C. § 1 states:

> "§ 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

15 U.S.C. § 15 states:

> § 15. Suits by persons injured; amount of recovery

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

118, 155 (S.D.N.Y.1972), it was recently stated:

> "The key element of proof for linking an Association member to the acts of his organization is a showing that *he knew of and condoned the act in issue.*" (Emphasis added.)

■ This court considered the issue in *Northern California Pharmaceutical Association v. United States*, 306 F.2d 379 (9th Cir.), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962). That was a criminal case. The indicted defendants were the association, an incorporated California trade association, and one Donald Hedgpeth. The members themselves were not parties to the proceeding as defendants and to this extent the case becomes dissimilar. Hedgpeth, a pharmacist, prepared a price schedule for noncompounded prescriptions which the corporation distributed to its members. In connection with the evidence required to convict the two defendants who were indicted the court said:

> "The co-conspirators are the Association as an active and independent legal entity, its officers, directors and committeemen insofar as they have carried on proscribed conduct, and those members of the Association who have *knowingly, intentionally and actively participated in an individual capacity in the scheme* which is said to result in the unlawful conspiracy. Thus, to the limited extent that it carries on unlawful activity, the Association is itself a sort of continuing agreement by which the fixing of prices might be effectuated. *This does not mean*, however, that *every member of the Association, by reason of his membership alone, becomes a co-conspirator.* Knauer v. United States, 237 F. 8, 19–20 (8th Cir. 1916). Knowledge and participation are required. Nor will proof of parallel business behavior alone conclusively establish agreement. Theatre Enterprises v. Paramount, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954)." *Northern California Pharmaceutical Ass'n v. United States*, 306 F.2d 379, 388–389 (9th Cir.), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962). (Footnotes omitted.) (Emphasis added.)

It thus clearly appears that in order for a member of a trade association to become guilty in a criminal case or liable in a treble damage case he must have "knowingly, intentionally and actively participated in an individual capacity in the scheme."

Plaintiffs' reliance upon this case and *Plymouth Dealers' Association of North California v. United States*, 279 F.2d 128 (9th Cir. 1960), to prove liability by continued membership is mistaken. In *Plymouth Dealers' Association* the action was a criminal prosecution against the association, a corporation. There, again, the court approved instructions which required the jury in order to convict to find that there was an agreement "that the defendant should formulate retail list prices for Plymouth motor cars" and "that the price schedules so agreed upon were a substantial part of the price structure used in the sale of Plymouth motor cars." *Id.* at 130 n. 3. But the court in speaking of "the defendant," was referring only to the indicted corporate defendant, i. e., the Dealers' Association. The liability vel non of the association members was not in issue because they were not defendants although they were described as co-conspirators. Nor is there any indication from the opinion that the dealer members were parties in any agreement.

■ We would read *Plymouth Dealers' Association* as elaborated by *Northern California Pharmaceutical Association* as establishing the law of this circuit that the printing of a price schedule and its distribution to members is not enough to establish civil or criminal liability. Proof here, therefore, even by admission of the Realty Board that it prepared a suggested commission schedule and distributed it to its members does not establish the illegal conduct necessary for a recovery.

■ Plaintiffs also rely heavily upon *United States v. National Association of Real Estate Boards*, 339 U.S. 485, 70

S.Ct. 711, 94 L.Ed. 1007 (1950). In that action the Supreme Court stated:

> "The Board's code of ethics provides that 'Brokers should maintain the standard rates of commission adopted by the board and no business should be solicited at lower rates.' Members agree to abide by this code." 339 U.S. at 488, 70 S.Ct. at 714.

There is no evidence here of such an ethic or such an agreement. The Court went on to say:

> "Price-fixing is *per se* an unreasonable restraint of trade. It is not for the courts to determine whether in particular settings price-fixing serves an honorable or worthy end. / *An agreement, shown either by adherence to a price schedule or by proof of consensual action fixing the uniform or minimum price*, is itself illegal under the Sherman Act, no matter what end it was designed to serve. Id. at 489, 70 S.Ct. at 714. (Emphasis added.)

Thus, the *Real Estate Boards* case would appear to require for a *per se* violation by members (1) an agreement and (2) adherence or consensual approval. In fact, the Court declined to reverse a district court's finding that two of the defendants, the National Association and one Herbert Nelson, were not participants in the conspiracy upon the basis that the code of ethics of the National Association, that the fee schedule "should be observed," was somewhat ambiguous. Said the Court, "it may be advisory only." *Id.* at 495.

■ So we cannot be persuaded that in this case proof of conspiracy or proof of illegal conduct of each defendant may be accomplished by generalized means. The legal significance of the written document and the rules or bylaws of the Realty Board and the method of compiling the document may indeed be a question of law and fact common to all defendants. But membership liability is inherently an individual question. It cannot be answered by generalized "Membership-Ratification" (mere continuation of membership) of any type suggested by appellees.

■ Plaintiffs have also misused the "Adherence" theory. Under this approach if Broker A receives the fee schedule and follows it in his pricing, Broker A would be liable as having adhered to the conspiracy. The fact that Broker A has adhered does not, however, prove that Broker B did so. Nor does the fact that a "substantial" number of brokers adhered prove that Broker B did so also. None of the cases cited by appellee establishes that mere parallelism conclusively establishes liability. *Northern California Pharmaceutical Association, supra,* holds to the contrary. Once again, this issue involves individual questions and necessarily invites individual defenses. Each defendant is clearly entitled to come forward and prove that he did not know of the commission schedule or that he opposed it or ignored it or, perhaps, some other yet unknown defense.

On the question of the defendants' illegal conduct no adequate showing has been made that the questions of law or fact common to the members of the class predominate over the questions affecting individual members.

*B. Establishing the plaintiffs' injury, i. e., the damages' issue.*

■ In order to certify the action as a proper class action it is necessary to demonstrate that the class action is superior to other available methods for the fair and efficient adjudication of the controversy as required by Rule 23(b)(3). Proof of injury is an essential substantive element of the successful treble damage antitrust action. Gray v. Shell Oil Co., 469 F.2d 742, 748 (9th Cir. 1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 n. 1 (9th Cir.), cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). Here there was apparently no showing made in support of the question whether "economic reality" might dictate that this action proceed as a class action or not at all. Eisen v. Carlisle & Jacquelin, 416 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

The matter is not discussed in the briefs. The prayer for estimated damages indicates that in many instances the damages if recoverable would be substantial. The fact that sales of 12-unit complexes are included in the disputed transactions also points in that direction.[5] Thus the potential benefit to the proposed class by the use of Rule 23 does not rise to the same dimension as those where the damage award sought is only $70. Eisen v. Carlisle & Jacquelin, *supra*, or $2, In re Hotel Telephone Charges, 500 F.2d 86 (9th Cir. 1974). It is also entirely probable that a goodly number of the total transactions would not be litigable for one reason or another;[6] and, of 'course, some of the larger brokers and brokerage firms could reasonably be expected over the 4-year period to have a substantial number of residential transactions which would be involved in a single action against that one defendant; and finally, some of the absentee plaintiffs might not desire to become involved in the litigation at all.

▆ The allegation is that from the 400,000 to 800,000 transactions during the period in question damages will be proved in excess of $250 million which trebled will aggregate $750 million. In addition, plaintiffs are asking for costs and attorneys' fees. All of these elements of recovery are within the provision of 15 U.S.C. § 15. The amounts are staggering. In addition, the prayer is for recovery against the defendants jointly and severally. State of Washington v. American Pipe & Construction Co., 280 F.Supp. 802 (S.D.Cal.) mandamus denied sub nom., American Pipe & Construction Co. v. Pence, 393 F.2d 568 (9th Cir.) (unrelated issue), cert. denied, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113

(1968). This means that the small individual operator faces a potential liability of upwards of three-quarters of a billion dollars for which all of his or her assets are responsible. The amount of a recovery in a lawsuit is not ordinarily of concern where a wrong has been inflicted and an injury suffered. But when 2,000 are joined in an action in which each is jointly and severally liable, the liability is increased in geometric · progression. Such an award against each of 2,000 real estate broker defendants would shock the conscience.

In somewhat similar circumstances, class actions have sought outrageous amounts in statutory penalty cases such as the $100 minimum under the Truth in Lending Act of 1968. Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y.1972) (aggregate of $13 million sought); Shields v. First National Bank of Arizona, 56 F.R.D. 442 (D.Ariz. 1972) (aggregate of $100 million sought); Alsup v. Montgomery Ward & Co., 57 F.R.D. 89 (N.D.Cal.1972) (aggregate of $20 million sought in one consolidated case and $8 billion in another); Gerlach v. Allstate Insurance Co., 338 F.Supp. 642 (S.D.Fla.1972) (aggregate of approximately $1 billion sought). In each case cited the district court denied class action treatment. Judge Frankel in *Ratner* among other reasons stated:

> "Briefly, if perhaps too broadly, stated, the reasons against maintenance of this as a class action are:
>
> "(1) there is no affirmative need or justification for such a proceeding in the actual circumstances of the case; and
>
> "(2) the allowance of thousands of minimum recoveries like plaintiff's would carry to an absurd

---

**5.** Assuming 400,000 transactions causing damage by excess commissions in the estimated sum of over $250 million the average recoverable damage amounts to $625. ˙ Trebled, the individual recovery would amount to $1,875 and the aggregate to $750 million the amount of the prayer. To arrive at that average figure, obviously many damage claims have been estimated that would result in a figure considerably in excess of that average.

Since attorneys' fees and costs are also recoverable in a successful 15 U.S.C. § 15 action, it may be safely assumed that a great many of the cases could be separately prosecuted.

**6.** Affidavits of some defendants in the file vehemently assert that they did not follow the Board's suggestions; others may assert other defenses which would make litigation of a claim a poor plaintiff's risk.

and stultifying extreme the specific and essentially inconsistent remedy Congress prescribed as the means of private enforcement." 54 F.R.D. at 414.

This court stated in LaMar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973):

"The clear trend of authority for actions alleging a violation of the Consumer Credit Protection Act . . . holds that class actions are inappropriate."

▮▮▮▮ We find that the same reasoning applies to treble-damage actions under the Sherman and Clayton Acts. Under those statutes compensatory damages must be trebled, Locklin v. Day-Glo Color Corp., 429 F.2d 873, 878 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). The trebling of damages in such cases is a statutory punitive measure. As expressed by Judge Learned Hand in Lyons v. Westinghouse Electric Corp., 222 F.2d 184, 189 (2d Cir.), cert. denied, 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955), ". . . two thirds of the recovery is not remedial and inevitably presupposes a punitive purpose." The intent of Congress under section 4 of the Clayton Act, 15 U.S.C. § 15, appears to have been to impose punishment upon the violator of section 1 of the Sherman Act for his own malefactions not to subject him to vicarious liability by the coincidence of a class action for the staggering damages of the multitude. For example, if the sole enterprise real broker with a small suburban business finds that out of $10,000 in commissions he has earned in the year past, $1,000 has been determined to consist of overcharges for which in an antitrust action, he becomes obligated to pay $3,000 as treble damages. But because he joined a realty board and received and followed suggestions as to proper commissions he is now obligated legally to pay $750 million. At some point the logic of the law leads in this situation to an ad absurdum result. We believe this is it.[7] In the light of the problems engendered by the requirement of proof of damages, we cannot find that under Rule 23(b)(3) this class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## II. Manageability of the Action.

The final consideration for class action status involves the question of manageability under Rule 23(b)(3)(D), i. e., "the difficulties likely to be encountered in the management of a class action." This problem was recognized by the Advisory Committee's Notes on the Proposed Amendments to Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966), where the Committee discussed the types of cases which would generally qualify under the rule. It then by way of reservation pointed out that certain cases would be inappropriate as class actions stating as an example that a mass accident,

". . . resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways."

Here, as the plaintiffs state in their brief, they do not rely upon the "isolated fact of membership" in the Realty Board nor upon "mere conscious parallelism" of the members.

"Rather, plaintiffs rely on a combination of these and other relevant factors: the Los Angeles Realty Board distributes a recommended fee schedule to its members; the members of the Board receive and have knowledge

---

7. As pointed out in a slightly different context in Green v. Wolf Corp., 406 F.2d 291, 303 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969):

"Punitive damages can be justified only as retribution or as a deterrent measure.

Restatement, Torts § 908, Comment a; . . . The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages, 41 N.Y.U.L.Rev. 1159 (1966)."

of the fee schedule and maintain their membership in the Board; and the members of the Board adhere to the 'suggested' fee schedule in fixing their brokerage commissions."

But this is only the plaintiffs' case as to an individual defendant. There are 2,000 defendants. Perhaps such evidence would ·establish a prima facie case. But the defendant would then have the right to come forward and submit his proof;[8] he may categorically deny some of the proof of the plaintiffs or may submit matter in avoidance. This trial must repeat itself with individual differences some 2,000 times as far as we can discern based upon the pleadings before us now. There are some questions that would need be proved only once such as the distribution of the schedule, but there are other matters which would have to be gone into as many times as there were sales by that defendant during that 4-year period. One jury could obviously not try the facts as to all defendants. There is a serious question whether such ordinary trials could properly be referred to a master. And then, after the case on liability is submitted or tried, the same procedure would have to be followed as to damages.[9] It would appear that generalized treatment would soon fall into individualized law suits. At that point the actions become unmanageable as a class action.

For the foregoing reasons we conclude that the present action is unsuitable for class action treatment. We note that in making this determination we intimate no judgment on the merits.

8. It has been suggested that generalized proof of damages might suffice under Rule 23. But the rule does not eliminate the ultimate need for individual proof of damages by each member of the class. Nor does it foreclose the right of each defendant to assert his defenses before a jury if one is requested.

28 U.S.C. § 2072 states in pertinent part: "The Supreme Court shall have the power to prescribe by general rules, the forms of process . . . and the practice and procedure of the district courts and courts of appeals of the United States in civil actions . . . .
"Such rules shall not abridge, enlarge or modify any substantive right and shall pre-

The judgment of the trial court that the action may be tried as a class action is reversed.

DUNIWAY, Circuit Judge (concurring):

I concur in the judgment, but for somewhat different reasons.

*First*, I think that this case is controlled by the rationale of our decision in In re Hotel Telephone Charges, 9 Cir., 1974, 500 F.2d 86. That case, like this one, was an antitrust case, involving large classes of potential plaintiffs and defendants. We there held that the case was not a proper one for class action treatment for two reasons: (1) that common questions did not predominate over individual questions (see Rule 23(b)(3), F.R.Civ.P.), 500 F.2d at 88–90; and (2) that the proposed class action was not a superior method of adjudication (see Rule 23(b)(3)), 500 F.2d at 90–92. The facts here are not identical to those in *Hotel Telephone Charges*, but the differences are minor and, in my opinion, not significant enough to make the rationale of that case inapplicable to this one.

*Second*, I cannot believe that Rule 23, as amended, was intended or should be construed to authorize the kind of judicial juggernaut that plaintiffs and their counsel seek to create here. The plaintiffs Kline have been designated as the representatives of an estimated 400,000 sellers of real property in Los Angeles County, sellers of residential dwellings containing up to twelve units. The Klines sold one residence, in 1970, for $42,500. They paid a commission to one

serve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution." *See* Colgrove v. Battin, 413 U.S. 149, 161, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973); Class Action Symposium, 68 Nw.U.L.Rev. 991, 1049 (1974).

9. Again, generalized proof is suggested, as presumably a witness would testify as to what was a fair commission absent the schedule. But the defendant as to each transaction would be entitled to give his particularized version. The suggested commission schedule by its terms applies to "normal" sales.

broker, Lelah Pierson, of 6%, or $2,550. She is a named defendant. Their theory of damages is that, but for the charged conspiracy, the commission would have been less, but they do not tell us how much less. If we assume that the broker would have done her work for nothing, an obviously improper assumption, their maximum damages would be $2,550, which, trebled, would be $7,650. Realistically, this is a grossly exaggerated figure. Yet the plaintiffs seek to parlay their claim into a lawsuit on behalf of 400,000 sellers, not one of whom, so far as we are advised, except the Sherman plaintiffs, has indicated the slightest interest in suing anyone. The Shermans, too, made but one sale. They paid a 6% commission of $2,700, which was divided between two brokers, neither of whom is named as a defendant. The plaintiffs, by this device, seek to recover from Ms. Pierson, among 2,000 others, $750,000,000 in damages, plus attorneys' fees and costs.

The named defendants are 32 real estate brokers and five associations of real estate brokers. They have been designated as representatives of a class of 2,000 brokers. Only one of the "representative" defendants, Ms. Pierson, ever dealt with the "representative" plaintiffs Kline.

At oral argument, plaintiffs explained how easy it will be for them to identify the members of the respective classes. First, they propose, under the aegis of the court, to compel the defendant associations to furnish them with lists showing the name and address of every broker who was a member of any of them at any time during the four year period preceding the filing of this action. These brokers, estimated at 2,000, will be the class of represented defendants. Next, plaintiffs propose, under the aegis of the court, to compel each of these 2,000 brokers to search his files and supply the name and address of every person who, during the same period, paid the broker a commission on a sale of residential property containing twelve units or less. These persons, estimated at 400,000, will be the class of represented plaintiffs. Plaintiffs do not tell us at whose expense all this is to be done.

Next, notice will be sent to each of the 400,000 represented plaintiffs. I would expect that the Rule 23 notice to each "represented" plaintiff, as prepared by plaintiffs' counsel, would give him a brief description of the nature of the case, and then would tell him (Rule 23(c)(2)(A)) that he can "opt out," but would also tell him that, if he does not opt out, he will incur no financial obligation, while, if the suit is won, he will share in the loot. I wonder if this is proper. Why shouldn't a "represented" plaintiff be told that if he elects to participate in the alleged bonanza, he may, by so electing, subject himself to liability for his share of the costs of suit if the bonanza is not forthcoming? Why should the court offer him a free ride in a case in which the defendants' costs, if they win, may be very large, and will probably not be collectible from the named plaintiffs? Why shouldn't what I have said also apply to plaintiffs' attorneys' fees, unless there is an ironclad agreement by the attorneys that they will collect no fees from anyone if the suit is lost? Rule 23(c)(2)(B) states that the notice shall advise each member of the class that "the judgment, whether favorable or not, will include all members who do not request exclusion." In most cases, one of the incidents of an adverse judgment is liability for costs. No doubt it will be said that the potential liability for costs might cause many represented plaintiffs to opt out. If so, what is so wrong about that? It may also be said that the potential liability is meaningless. How would defendants collect? However, there may be a possible alternative. The real bonanza in a case like this, if it is won, will go to counsel. Perhaps the class action order could be conditioned upon an agreement by counsel that they will pay all costs of all defendants if the suit is lost!

Notice will also go to each of the 2,000 represented defendants. Here I note a peculiarity of Rule 23 that none of the

parties has mentioned. Rule 23(c)(2)(A) requires that the notice to each member of the class must advise him that "the court will exclude him from the class if he so requests by a specified date." I have read and re-read the rule and I can find nothing in it to indicate that this provision is not just as applicable to members of a "class" of defendants as it is to members of a "class" of plaintiffs. The notice, therefore, must tell the represented defendant that he can opt out. What member of a class of defendants who is in his right mind, and who is told that, if he does not elect to be excluded, he may be liable for $750,000,000 plus very large attorneys' fees and costs, will fail to opt out? It seems more than probable that the court, having gone to the trouble and expense of learning the name and address of each potential broker defendant and of devising a proper notice and having it sent out, will wind up with no "class" of defendants, but only those who are named as defendants and are served with process in the ordinary way. Yet this will not simplify the action if the 400,000 "plaintiffs" are brought in as a class. It will still be necessary for each such "plaintiff," if he is to share in the loot, to prove (a) that the broker with whom he dealt, whether the broker has opted out or not, participated in the conspiracy, and (b) that he was damaged by the conspiracy, and what his damages are. Opting out is not the same as defaulting—it confesses nothing. And it must be remembered that plaintiffs have demanded a jury trial.

I venture to suggest that none of the class action features of this case was dreamed up by the named plaintiffs, but that all of them are the brain children of their attorneys. In California, barratry is a crime (Cal.Pen.C. § 158). The Rules of Professional Conduct of the State Bar, authorized by Cal. Bus. and Prof. Code § 6076, provide (Rule 2 § a): "a member of the State Bar shall not solicit professional employment by advertisement or otherwise." Does solicitation cease to be solicitation when done under the aegis of a judge? If so, what has

become of the centuries old policy of the law against stirring up litigation? Did the Supreme Court, when it adopted Rule 23, as amended, intend to abrogate that policy for a case like this? I am loath to believe that it did. I also have grave doubt whether such a change in the law, if intended, can properly be called a matter of procedure. In other words, I doubt that the Supreme Court has power, by a procedural rule, to abrogate the policy to which I have referred, assuming that that is what the Court intended.

Perhaps more important is the practical effect of such a suit as this. The burden that it can impose on the court— discovery, pre-trial, notice to the classes, etc., and on a jury, if one is ever empanelled, is staggering. It is inconceivable to me that such a case can ever be tried, unless the court is willing to deprive each defendant of his undoubted right to have his claimed liability proved, not by presumptions or assumptions, but by facts, with the burden of proof upon the plaintiff or plaintiffs, and to offer evidence in his defense. The same applies, if he is found liable, to proof of the damage of each "plaintiff." I doubt that plaintiffs' counsel expect the immense and unmanageable case that they seek to create to be tried. What they seek to create will become (whether they intend this result or not) an overwhelmingly costly and potent engine for the compulsion of settlements, whether just or unjust. Most, though by no means all, real estate brokers are small business men. They cannot afford even to participate in such an action as this, much less to defend it effectively. I suspect, for example, that this is true of Ms. Pierson. It is almost inevitable, if the judge's order is permitted to stand, and even if all potential defendants opt out, that many of the named defendants will settle for whatever amount they can bargain for, and without regard as to whether they are really liable or not, with a good chunk of the money going to plaintiffs' lawyers.

I do not say that the Rule 23(b)(3) class action is always unethical and im-

properly coercive. Doubtless there are circumstances in which it is the only viable means of obtaining relief for classes of truly and actively aggrieved plaintiffs. But courts should not be in the business of encouraging the creation of lawsuits like this one.

I join in the judgment of reversal.